IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SANDRA LEE HAMBROOK, individually, as Personal Representative of the Estate of William Joseph Savage, deceased, and as Personal Representative for the benefit of Chelsea Savage and Nicolas Savage,<br><br>Plaintiff,<br><br>vs.<br><br>JAY J. SMITH; DENNIS A. McCREA; HAWAIIAN SCUBA SHACK S-22840; PADI AMERICAS, INC. and PADI WORLDWIDE CORPORATION, both dba Professional Association of Diving Instructors,<br><br>Defendants. | ) ) ) ) ) ) ) Civ. No. 14-00132 ACK-KJM ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

SYNOPSIS

This is an admiralty case brought by Plaintiff Sandra Hambrook ("Hambrook"), individually, as Personal Representative of the Estate of William Joseph Savage, deceased, and as Personal Representative for the benefit of her children, Chelsea Savage and Nicolas Savage, ("Plaintiff"), arising out of a tragic diving accident resulting in the death of Hambrook's husband, William Joseph Savage ("Bill"). Plaintiff filed her

First Amended Complaint on April 7, 2015 against Defendants Jay

Smith ("Smith"), Dennis McCrea ("McCrea"), Hawaii Scuba Shack S-

22840 ("HSS"), PADI Worldwide Corporation and PADI Americas,

Inc., both dba Professional Association of Dive Instructors,

(collectively, "PADI") (all, collectively "Defendants").[1]  First

Am. Compl. ("FAC"), ECF No. 89.  On June 2, 2015, the Court

granted PADI's Motion for Partial Summary Judgment as to

Plaintiff's count for negligence against PADI and as to two

vicarious liability claims raised against PADI.  Order Granting

Defendant PADI's Motion for Partial Summary Judgment and Denying

Plaintiff's Counter-Motion for Partial Summary Judgment

("Summary Judgment Order"), ECF No. 119.  The claims remaining

in Plaintiff's First Amended Complaint are (1) negligence as

against Smith, HSS, and McCrea; and (2) gross negligence against

all defendants.

On December 22, 2015 and December 23, 2015,

respectively, Defendant McCrea and Defendants Smith and HSS

filed counterclaims against Plaintiff Sandra Lee Hambrook,

---

[1]     Defendant PADI Americas, Inc. owns the trade name
Professional Association of Diving Instructors, and Defendant
PADI Worldwide Corporation is the parent company of PADI
Americas.

individually, for equitable subrogation, contribution, and or indemnity.  ECF Nos. 165-1, 166-1.[2] [3]

On August 1, 2016, the Court issued its Order Regarding Motions in Limine.  ECF No. 364.

For the reasons set forth herein, the Court finds and concludes that Smith/HSS was negligent with respect to the creation and execution of the dive plan, failure to give an adequate dive briefing, failure to use oxygen in conjunction with CPR together with McCrea to resuscitate Bill, and failure to have in place and implement an Emergency Action Plan.  The Court additionally finds and concludes that McCrea was negligent in his failure to give an adequate dive briefing, failure to use oxygen in conjunction with CPR together with Smith to resuscitate Bill, and failure to inquire about emergency action procedures.  The Court finds that Bill was twenty percent contributorily negligent insofar as he entered the overhead environment at Skull Cavern contrary to instructions he did not

---

[2]   Defendant PADI also filed a counterclaim against Hambrook, but voluntarily dismissed the claim.  ECF No. 195.

[3]   For ease of reference, the Court will use the terms "Plaintiff" and "Defendant(s)" and will not include the designations of "Counterclaim Defendant" and "Counterclaim Plaintiff(s)" when referring to the parties.

have the necessary training.  Thus, for the reasons discussed

herein and set forth below, the Court finds that judgment in

favor of Plaintiff and jointly and severally against Smith, HSS,

and McCrea is appropriate in the total amount of $2,201,974.41,

as set forth in more detail in the Court's Decision.  Because

the Court finds and concludes that Hambrook was not

contributorily negligent, judgment in favor of Plaintiff is also

appropriate with respect to the remaining counterclaims.

Finally, the Court finds and concludes that Plaintiff failed to

prove her claims against PADI.  Accordingly, judgment in favor

of PADI is appropriate for Plaintiff's claims against PADI.

A 12-day bench trial was commenced on June 21, 2016,

and completed on July 8, 2016.[4]  Having heard and weighed all the

---

[4]      After Plaintiff rested her case on the ninth day of
trial, July 1, 2016, PADI made an oral motion for judgment on
partial findings pursuant to Federal Rule of Civil Procedure
52(c) as to Plaintiff's claim against PADI for gross negligence.
Smith and HSS also made an oral motion pursuant to Federal
Rule of Civil Procedure 52(c) for judgment on partial findings with
respect to Plaintiff's claims for negligence and gross
negligence.  The Court heard argument on the motions and took
them under advisement.  In view of the decision herein, the
motions are moot and denied.
        The Court notes that Plaintiff sufficiently raised a
claim for negligent infliction of emotional distress damages in
the First Amended Complaint, which included allegations
regarding Hambrook, Chelsea, and Nicolas's witnessing of the
                                        (continued . . . )

evidence and testimony adduced at trial, having observed the demeanor of the witnesses and evaluated their credibility and candor, having heard the arguments of counsel and considered the memoranda submitted, and pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.  Where appropriate, findings shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

---

( . . . continued)

circumstances leading to Bill's death and alleged that all three had suffered emotional distress.  <u>See</u> FAC ¶¶ 25-28, 31, 50.

# Table of Contents

SYNOPSIS                                                    1

FINDINGS OF FACT                                            8

I.   The Parties                                            8

A.   Plaintiff                                              8

B.   Smith/HSS                                              8

C.   McCrea                                                 8

D.   PADI                                                   9

II.  The Family's Scuba Diving Training                    10

III. Selection of Smith/HSS and April 10, 2012 Dives      13

IV.  The Incident Dive – April 11, 2012                   14

A.   Selection of Dive Site                                16

B.   Assessment of Environmental Conditions                18

C.   Dive Plan                                             20

D.   Dive Briefing                                         25

E.   Execution of Dive Plan                                29

F.   Recovery and Tow to Boat                              41

G.   Use of Oxygen, CPR, & Emergency Action Plan           46

V.   Findings Related to Claims Against PADI               56

VI.  Pain and Suffering, Witnessing the Incident, Family
     Life, and Earning Capacity                            59

CONCLUSIONS OF LAW                                         65

I.   Jurisdiction and Venue                                65

II.  Applicable Law                                        67

III. Assumption of Risk, Waiver, and Releases              71

IV.  Negligence Claims                                     83

V.   Negligence Claims Against Smith/HSS                   86

A.   Selection of Dive Site                                86

B.   Assessment of Environmental Conditions                87

C.   Dive Plan                                             88

D.   Dive Briefing                                         89

E.   Execution of Dive Plan                                91

| | | |
|---|---|---|
| F. | Recovery and Tow to Boat | 92 |
| G. | Use of Oxygen, CPR, & Emergency Action Plan | 94 |
| H. | HSS Liability | 96 |
| VI. | Negligence Claims Against McCrea | 96 |
| A. | Dive Briefing | 96 |
| B. | Use of Oxygen, CPR, & Emergency Procedures | 98 |
| VII. | Gross Negligence Claims Against Smith/HSS and McCrea | 100 |
| VIII. | Claims Against PADI | 101 |
| IX. | Comparative Fault and Counterclaim | 107 |
| X. | Damages | 112 |
| A. | Pre-Death Pain and Suffering | 112 |
| B. | Loss of Support | 114 |
| C. | Loss of Services | 117 |
| D. | Loss of Society | 121 |
| E. | Emotional Distress | 123 |
| F. | Hedonic Damages | 125 |
| G. | Punitive Damages | 127 |
| H. | Prejudgment Interest | 128 |
| XI. | Calculation of Damages | 130 |
| XII. | Joint and Several Liability | 132 |
| DECISION | | 133 |

**FINDINGS OF FACT**

I.   **The Parties**

A. **Plaintiff**

1.   Plaintiff Hambrook is a Canadian citizen from the city of Calgary, in Alberta province.  Hambrook Trial Tr. 8-59. Hambrook and Bill were married in Canada on September 4, 1993. Id. 8-66.  Their daughter Chelsea was born in 1994 and their son Nicolas was born in 1998.  Id. 8-68.  At the time of the incident, Hambrook was 50, Bill was 49, Chelsea was 17, and Nicolas was 13.  Hambrook Trial Tr. 8-59, 8-68.

B. **Smith/HSS**

2.   Smith is the owner and sole proprietor of Hawaiian Scuba Shack, a scuba diving company in Kailua-Kona in Hawaii. Smith Trial Tr. 1-59-61.  Smith and HSS own an unnamed 28-foot vessel that was used during the dive incident at issue.  See id. 1-71.  Smith became a certified diver in 1978, a PADI Open Water Scuba Instructor in 1999, and a Master Scuba Diver Trainer/Instructor in 2006.  Id. 1-59-60.  Prior to 2012, Smith had trained approximately 300 divers.  Id. 1-61.  Smith obtained a Coast Guard License in 1984 and he still holds the license. Id.

C. **McCrea**

8

3.   McCrea first became certified in open water scuba diving in 1981 or 1982 through the National Association of Underwater Instructors ("NAUI").  McCrea Trial Tr. 3-32.  McCrea received a rescue diver certification from NAUI in 1985 or 1986 and became a NAUI instructor in 1988.  Id. 3-33.  In 1990, McCrea became a PADI certified Open Water Scuba Instructor.  Id. 3-35; Ex. 269.  He later became a PADI certified Master Scuba Diver Trainer in 2005 and a certified Emergency First Responder instructor in 2007.  Id. 3-38-39; Ex. 267; Ex. 268.

### D. PADI

4.   PADI is a world leader in scuba diving training.  PADI teaches scuba diving training courses, provides certifications for various different areas of scuba diving, and publishes training manuals and other documents related to scuba diving. PADI holds Member Forums for dive professionals in various regions, including in Kona, to provide information about, among other things, changes to standards.  Hornsby Trial Tr. 8-40. Emergency First Response Corporation ("EFR") is a wholly owned subsidiary of PADI Americas, Inc.  Hornsby Trial Tr. 7-34, 7-41. EFR provides first aid and CPR training to the public.  Ex. 182 (Hornsby Dep. Tr. 51).  EFR publishes a quarterly publication called "The Responder" which includes updates to its member

instructors regarding dive standards as well as other information.

## II.   The Family's Scuba Diving Training

5.   On the weekend of January 29-31, 2010, Bill, Hambrook, and Nicolas received beginner's recreational scuba diving training in a classroom and pool in Calgary.  Ex. 180 (Engel Dep. Tr. 24-25); Hambrook Trial Tr. 8-78.

6.   They were taught basic scuba skills in the PADI Open Water Scuba Diver training course by PADI Instructor Ronald Engel ("Engel"), including buoyancy control and regulator recovery.  Ex. 180 (Engel Dep. Tr. 16); Hambrook Trial Tr. 8-78-79.

7.   During the family's training, they were provided with PADI's Open Water Dive Manual.  Ex. 11.  The manual instructs on how to establish positive and negative buoyancy, how to maintain neutral buoyancy, and how to use one's Buoyancy Control Device or Buoyancy Compensator Device ("BCD") to float at the surface of the ocean until assistance or rescue arrives in an emergency situation.  Ex. 11 (Open Water Diver Manual), at 13-14, 154-55.

8.   Engel recommended that for future scuba diving, the family should dive with PADI professional dive supervisors for their safety.  Hambrook Trial Tr. 80-81.

9.   Engel's recommendation accords with the PADI Open Water Manual used by Engel in the family's Calgary classroom and pool training.  Ex. 11 (Open Water Diver Manual), at 235 (recommending PADI Discover Local Diving orientation in a new area).

10.  PADI encourages its instructors to tell its Open Water students to seek a local orientation when diving in a new area after they become certified divers.  Ex. 182 (Hornsby Dep. Tr. 102).

11.  After the pool training, the PADI Open Water course requires four training dives with a PADI Instructor in open water outside of a swimming pool.  Ex. 183 (DiBiasio Dep. Tr. 33-36).

12.  In February 2010, on Maui, Bill, Hambrook, and Nicolas completed their four open water training dives with the "Maui Dreams" dive shop under the instruction of PADI Instructor Paul DiBiasio ("DiBiasio").  Id. 33-36; Hambrook Trial Tr. 8-81.

13.  Although there was indication in the family's divelogs that they experienced some waves and surge during these training dives, both DiBiasio and Hambrook testified that the dives were conducted in mild and calm ocean conditions without significant

waves or surge.  Exs. 1-3; Hambrook Trial Tr. 8-81; Ex. 183 (DiBiasio Dep. Tr. 48-50, 63-66).

14.  After completion of the four open water training dives, DiBiasio certified Hambrook and Bill as PADI Open Water Scuba Divers, and Nicolas as a PADI Junior Open Water Scuba Diver.  Ex. 411 (Maui Dreams Dive Company Business Records), at 5, 12, 25.  A Junior Open Water certification is given to children under 15 years old.  Weber Trial Tr. 5-59.  Junior divers are restricted to diving at a maximum depth of 40 feet and are required to dive with a certified PADI professional or a parent.  Id. 5-59-60.  There are also restrictions regarding the size of the dive group for junior divers.  Id. 5-60.

15.  Before leaving Maui, Bill, Hambrook, and Nicolas booked a boat dive excursion with Maui Dreams in which Bill and Hambrook participated in one scuba dive each as newly certified divers, and Nicolas did two, diving with each of his parents separately.  Hambrook Trial Tr. 8-82.  Both of the dives were conducted in calm ocean conditions.  Id.

16.  In 2012, the family planned a vacation to Kona during which Bill, Hambrook, and Nicolas hoped to scuba dive and Chelsea hoped to snorkel.  Hambrook Trial Tr. 8-82-83.

17.  Because they had not done any diving since their 2010 Maui trip, before they left Calgary, they took a one-day PADI "refresher" course recommended by Engel in their initial training.  Hambrook Trial Tr. 8-83.

III. **Selection of Smith/HSS and April 10, 2012 Dives**

18.  Once they arrived in Kona, Bill and Hambrook looked for a PADI dive shop where they could go scuba diving under the supervision of a PADI professional and found Smith and HSS. Hambrook Trial Tr. 8-84-86.

19.  PADI standards required that all recreational diving and snorkeling tours offered by HSS be supervised by a certified PADI divemaster or Instructor.  Ex. 182 (Hornsby Dep. Tr. 79-80).

20.  Bill and Hambrook told Smith that they were new divers with limited experience, informed him that their son Nicolas, 13 years old at the time, was certified only as a PADI Junior Open Water Scuba Diver, and that they wanted easy, safe, and supervised diving.  Hambrook Trial Tr. 8-86.

21.  Hambrook mentioned to Smith that she was interested in seeing lava tubes under water.  Hambrook Trial Tr. 8-86; Smith Trial Tr. 1-92.

22.  Bill and Hambrook signed boat travel and scuba releases of liability and assumption of risk in favor of all

13

defendants for themselves and their children.  Smith Trial Tr. 1-64; Exs. 208-211.  This was the third time they had signed similar releases and assumptions of risk.  Hambrook Trial Tr. 9-150-161.  They previously signed them in favor of their Calgary scuba instructors and again in favor of their Maui scuba instructor in 2010 when they took their Open Water diver courses.  Id.; Ex. 224-226; Ex. 232.

23.  Bill and Nicolas went on two dives with Smith on April 10, 2012.  Hambrook Trial Tr. 9-163.  Both dives were at the Garden Eel cove in Kona, Hawaii.  Smith Trial Tr. 1-66-67.  Their first dive was between 5:00 p.m. and 6:15 p.m.  Id. 1-67.  The second dive was a night dive to observe Manta Rays under water.  Id. 1-76.

## IV.  The Incident Dive – April 11, 2012

24.  The planned second day of diving was April 11, 2012.  Smith Trial Tr. 1-66.  Bill, Hambrook, Nicolas, and Chelsea boarded the HSS dive boat at Honokohau Harbor in Kona shortly after 8:30 a.m.  Hambrook Trial Tr. 8-88; Smith Trial Tr. 1-91-92.  Chelsea was aboard to spend time on the boat with her family and snorkel.  Chelsea Trial Tr. 5-186-187.  On the day of the incident dive, Bill was wearing his own fins, mask, and snorkel, and was using the same BCD and regulator that had been provided

14

to him by Smith/HSS on April 10, 2012.  Smith Trial Tr. 1-71, 1-81.  Bill's scuba air tank was supplied by Smith.  <u>Id.</u> 1-81.

25.  Smith hired McCrea to assist on the day of the dive. Ex. 179 (McCrea Dep. Tr. 27, 29).  McCrea served as captain of the vessel while Smith and the other divers were in the water, as required by the United States Coast Guard, and his responsibilities included assisting to load gear onto the boat, helping Smith launch the boat, mooring the boat, and helping to put the divers into the water.  <u>Id.</u> 29.  McCrea testified that he was an independent contractor for Smith, but noted that while serving as a captain on the vessel he was under Smith's control. <u>Id.</u> 27, 29-30.  McCrea additionally agreed that while working for Smith, he accepted the fact that Smith "would tell [him] what to do."  <u>Id.</u> 30.

26.  McCrea had only worked with Smith aboard the HSS dive boat three to four times per year, over a three to four year period.  McCrea Trial Tr. 3-107.

27.  Smith testified that he had not experienced a previous scuba diving incident as a divemaster, dive guide, or boat captain.  Smith Trial Tr. 2-20.  There was no evidence that McCrea had experienced a prior incident related to scuba diving.

**A. Selection of Dive Site**

28.  Smith chose a dive site called Suck 'Em Up, Skull
Cavern, which was about a ten-minute boat ride North of
Honokohau Harbor.  Smith Trial Tr. 1-92; 2-70.  The State of
Hawaii establishes and maintains an underwater mooring ball
there for boats to use.  Id. at 1-93-94.

29.  The site's name comes from two adjoining eroded lava
tube formations.  Ex. 57 (DVD footage of site taken by Keller
Laros).  Suck 'Em Up is a longer, tubular formation, more
closely resembling a traditional lava tube.  Id.  The adjoining
formation, Skull Cavern or Skull Cave, is a generally circular
formation with two side-by-side vertical entrances facing
seaward.  Id.  The two entrances are also referred to as arches
or eyes, as they resemble the eyes of the skull, giving the
formation its name.  At Skull Cavern, the top of the formation is
open in a large circular shape where the roof of the lava tube
collapsed, creating a large "skylight."  Ex. 90 (Laros sketch).
Although the dive site is sometimes generally referred to as
Suck 'Em Up, this case involves the adjoining structure, Skull
Cavern.

30.   Smith testified that he chose the dive site because
one of the divers asked to see lava tubes under water.  Smith
Trial Tr. 1-92.

31.   There was evidence presented that the dive site chosen
is generally appropriate for inexperienced certified divers.  A
dive map of the area referred to as "Franko's Dive Map" lists
"SUCK-EM-UP CAVERN" as a "[c]ave . . . good for beginners."  Ex.
221 (Franko's Dive Map).  Plaintiff's expert testified that she
has previously taken inexperienced certified divers to the site
and Defendants' expert testified that the site was commonly used
for beginners.  Weber Trial Tr. 5-126; Gingo Trial Tr. 10-111-
112.  Defense witness Keller Laros testified that the dive site
is very popular and at least two boats a day if not more use the
dive site.  Laros Trial Tr. at 9-39.

32.   Based on this evidence, the Court finds that the dive
site was commonly used by other dive professionals for
inexperienced certified divers and that it was reasonable for
Smith to conclude that the site was appropriate to the extent
the divers were going to be looking at but not entering the
arches at Skull Cavern, which would involve entering an overhead
environment.  As discussed further below, Hambrook, Bill, and

17

Nicolas did not have training on diving in an overhead environment, which PADI required.

## B. Assessment of Environmental Conditions

33.  There was ample testimony that when the boat reached the dive site mooring the conditions were calm.  On the way to the dive site, Smith observed the wave sets "rolling in" and did not see any waves exceeding two feet.  Ex. 178 (Smith Dep. Tr. 243).  Once they arrived at the dive site, Smith testified that he stayed on the boat for at least ten minutes prior to the start of the dive.  Id. 242-43.  During this time, McCrea jumped in the water to moor the boat and assess the conditions.  Id. While McCrea was in the water, Smith was able to see if there was movement in the water that affected the mooring line and while watching McCrea swim back to the boat, Smith could see whether McCrea was being moved by the ocean.  Id.  Smith could also see the wave sets and "how stable the boat is without rocking and bouncing."  Id. 243.  When the divers entered the water, Smith testified there were only one to two foot waves. Id. 195.  Once Smith entered the water for the dive, the visibility under water was approximately 75 feet.  Smith Trial Tr. 2-22.  Smith also noted that the weather conditions were calm and the wind was very mild.  Ex. 178 (Smith Dep. Tr. 179).

18

34.   McCrea testified that when they arrived at the mooring, Smith decided the conditions were fine and he concurred.  McCrea Trial Tr. 3-65.  McCrea then entered the water to moor the boat.  At this point, McCrea noted that visibility was clear, the mooring ball was sticking straight up— indicating there were no conditions adverse to diving—and there was no current.  Id. 3-65-66.  McCrea also testified that the weather was clear and that there was no wind, rain, or clouds. Id. 3-67.  He observed waves coming in at the rocky shoreline at the dive site and estimated that the waves were one to one-and-a-half-feet and sometimes two to two-and-a-half-feet "but there was nothing crashing anywhere on the shoreline."  Id. 3-112.

35.   Nicolas testified that the conditions on the way to the dive site were calm and nice and he did not recall any swells in the ocean.  Nicolas Trial Tr. 2-174.  According to Nicolas, no one expressed concern regarding the weather or ocean conditions on the way to the dive site.  Id.

36.   Chelsea testified that when they arrived at the dive site she noticed the water rising and falling and crashing over the rocks.  Chelsea Trial Tr. 5-131-132.  However, she also testified that she did not recall anyone commenting about the ocean conditions on the way to the dive site or once they

19

arrived, and that the weather was clear and it was a sunny morning.  Chelsea Trial Tr. 6-93-94.

37.  Based on this evidence, the Court finds that Smith acted reasonably in assessing the dive conditions prior to starting the dive.  The testimony presented indicated that the weather and ocean conditions were appropriate for diving and Smith's testimony that he assessed the conditions for several minutes, with the assistance of McCrea, prior to starting the dive was uncontroverted.  Thus, the Court finds that Smith appropriately conducted an assessment of the environmental conditions prior to starting the incident dive.

**C. Dive Plan**

38.  Throughout the proceedings, Defendants have maintained the position that there was never any intent for the divers to enter an overhead environment, such as the arches at Skull Cavern.  See, e.g., McCrea & PADI Proposed Findings of Fact, Conclusions of Law and Order, at 7, 29, ECF No. 282-1 (proposing findings and conclusions related to the dive not involving entering an overhead environment); Smith Proposed Findings of Fact, Conclusions of Law and Order, at 7, 32, ECF No. 286 (same); McCrea & PADI Post-Trial Proposed Findings of Fact, Conclusions of Law and Order, at 8, 41, ECF No. 362 (same);

20

Smith and HSS Post-Trial Proposed Findings of Fact, Conclusions of Law and Order, at 9, 10, 47, ECF No. 363-1 (same).  However, Smith testified during his deposition and at trial that he planned to take the divers to the entrance of Skull Cavern, settle near the bottom, assess the skill level and competency of the divers and then based on the conditions decide whether or not the divers should enter Skull Cavern.  Ex. 178 (Smith Dep. Tr. 228); Smith Trial Tr. 2-78.  Smith repeatedly noted that the dive plan included the possibility that the divers would enter the archways at Skull Cavern.

39.  Moreover, the Complaint and the First Amended Complaint contained the allegation that McCrea informed the divers that they would see two entrances to a cavern or archway and "that they should go in the entrance on the right."  Compl. ¶ 18, ECF No. 1; FAC ¶ 17.

40.  Hambrook testified that she anticipated the dive would be a bottom dive and would not involve an overhead environment.  Hambrook Trial Tr. 9-165-66.  She additionally testified that prior to the dive, McCrea informed them that they would be entering an arch that would open to a skylight, but that she did not expect the arch would be an overhead environment.  Id.  Nicolas testified that he was told prior to starting the dive

21

that they were going to be entering an opening that looked like the eye of a skull.  Nicolas Trial Tr. 2-120.

41.  An overhead environment is generally defined as an area where direct vertical access to the surface is not possible.  Ex. 182 (Hornsby Dep. Tr. 121).  The vast majority of the testimony indicated that the archways at Skull Cavern are considered overhead environments, and the Court so finds based on this evidence.  Smith Trial Tr. 2-61; Weber Trial Tr. 5-64-65; Laros Trial Tr. 9-46; Gingo Trial Tr. 10-203-204.  PADI representative Al Hornsby, who had never visited the site, testified that "if access to the surface is available, even if it's at a slight angle, then you wouldn't formally consider it an overhead environment," but acknowledged that determining whether something is an overhead environment is "situational" and would be a "hard call" in this instance.  Hornsby Trial Tr. 8-45-46.

42.  The Court notes that it finds problematic that Defendants throughout the trial continued to insist that the dive plan never included the possibility of entering an overhead environment, although Smith clearly testified otherwise both during his deposition and at trial and both the Complaint and First Amended Complaint contained contradictory information.

22

43.  According to Plaintiff's expert Janet Weber, there are specific hazards and risks involved with being "in shallow, overhead areas," which are encountered at Skull Cavern.  Ex. 69 (Weber Report), at 6.

44.  There was also testimony that diving in an overhead environment requires specialized training.  Defense diving expert Glennon Gingo ("Gingo"), for example, testified that overhead environments "require additional training to understand how to dive in an overhead environment situation."  Gingo Trial Tr. 10-197.  Engel, who originally trained the divers in Canada, similarly testified that divers who do not receive specialized training for overhead environments are not qualified to dive in an overhead environment.  Ex. 180 (Engel Dep. Tr. 200).

45.  The PADI Open Water Diver Manual also provides that diving in overhead environments is inappropriate absent specialized training.  Ex. 11 (Open Water Diver Manual), at 139.  The Manual notes that training in open water diving prepares for diving in open water but that once a diver loses the ability to ascend directly to the surface the "risk and the potential hazards go up dramatically."  Id.  The Manual further warns that one of the leading causes of death in scuba diving is going into an overhead environment "without the proper training and

23

equipment." Id. Gingo testified that it is appropriate for a divemaster to follow PADI training. Gingo Trial Tr. 10-196.

46. There was also evidence presented that surge and wave sets can sometimes make entering Skull Cavern dangerous even for experienced divers. Ex. 69 (Weber Report), at 8. According to Weber, Skull Cavern is set against the shoreline in shallow water with an entrance at 20 feet, but the rear of the cavern under the skylight is only 8 to 10 feet. Id. "The edge of the skylight, or top of the cavern, is the rocky ledge of the shoreline." Id. The configuration of Skull Cavern, including its location on the shoreline, allows for wave movement to create surge. Weber Trial Tr. 5-21-22.

47. Hambrook, Nicolas, and Bill never received training specific to overhead environments. They were all beginner PADI-certified divers who had completed only between 5-8 dives each. Nicolas was a junior diver requiring additional considerations with regards to his safety. The divers informed Smith of their limited training and diving experience so that Smith should have been aware that they had not received training with respect to overhead environments. Based on this evidence, including the hazards associated with entering the arches at Skull Cavern, the Court finds and concludes that Smith's dive plan, insofar as it

24

included the possibility of taking the divers into the overhead environment at Skull Cavern, was not reasonable under the circumstances.   The Court further finds that in this respect, Smith enhanced the inherent risks and hazards associated with the dive.

### D. Dive Briefing

48.   Before getting into the water, Hambrook testified that she, Bill, and Nicolas were told by McCrea only that they were to go down the mooring line, proceed toward shore following Smith, that they should stay low in the water, and that they would then "go through an archway on the right."   Hambrook Trial Tr. 8-89-90, 9-118-120.

49.   Nicolas testified that he was not sure who gave the dive briefing, but the only information presented was that the divers were going to swim around a rocky area near the shore, go through an opening that looked like the eye of a skull, and that they should avoid surface water and stay at depth.   Nicolas Trial Tr. 2-120, 2-173-74.

50.   Chelsea testified that while her father was in distress during the dive, she heard McCrea say something along the lines of "I told them to stay away from the rocks."   Chelsea Trial Tr. 5-132.

51.   McCrea testified that he did not provide a dive briefing regarding the hazards, overhead environment, or the conditions, and he stated that it was not his job to provide such warnings.  McCrea Trial Tr. at 4-166-167.  McCrea testified that Smith was the one who gave the dive briefing, but admitted that he had told Hambrook the name of the dive site.  Ex. 179 (McCrea Dep. Tr. 104-05); McCrea Trial Tr. 4-166.  According to McCrea, prior to the dive he helped the divers get their equipment on and checked to make sure that the divers knew how to operate their BCDs.  McCrea Trial Tr. 3-60-61.  McCrea also stated that he had no awareness regarding Bill, Hambrook, and Nicolas's dive experience level.  Ex. 179 (McCrea Dep. Tr. 149).

52.   Smith, in turn, testified that he gave a dive briefing prior to the dive and that during the briefing, he informed the divers to stay away from water movement, to stay low and negatively buoyant, and he showed them how to use hand signals as well as how to use their BCDs.  Smith Trial Tr. 1-102-103.  Smith testified that he told the divers that if they saw white water, which may look like champagne bubbles, they should not swim towards it.  Id. 1-103.

53.   Smith admitted that he did not give a specific warning about the waves and surge at the dive site, including the

26

possibility that there would be wave sets.  Ex. 178 (Smith Dep. Tr. 248-49).  Smith admitted that "wave sets" are a foreseeable occurrence in Hawaii and that the Kona Coast often experiences wave sets.  Smith Trial Tr. 2-77; Ex. 178 (Smith Dep. Tr. 249).

54.  According to Plaintiff's diving expert Weber, divers at Skull Cavern should be warned about surge, given the possibility of surge at the dive site.  Weber Trial Tr. 5-62-63. Weber testified that wave and surge action at the dive site are foreseeable dangers that are well known to the Kona professional diving community.  Id. 5-37-38.  Weber's expert report also noted that the divers should have been briefed regarding the dangers "involved with being in shallow, overhead areas, and how to minimize potential problems."  Ex. 69 (Weber Report), at 6.

55.  Defendants' diving expert Gingo admitted that if a dive plan involved going through an overhead environment, a reasonably prudent divemaster would warn of overhead environment entry and advise about procedures to be used when entering an overhead environment, such as Skull Cavern.  Gingo Trial Tr. 10-201-203, 204-205.  Gingo also testified that in this case there were no warnings specifically related to an overhead environment.  Id. 10-204-205.

56.  With respect to the waves and surge, Gingo also admitted that the divers were not given specific warnings about the waves and surge at the site and that a reasonably prudent divemaster would have explained the surge conditions at this particular dive site.  Id. 10-173-174, 10-196.  Gingo noted that the divers were warned about the possibility of champagne bubbles, but testified that it is possible to have surge conditions without champagne bubbles.  Id. 10-173.

57.  The Court finds that based on the evidence, both Smith and McCrea provided dive briefings on the day of the incident dive.  The Court credits Hambrook's testimony insofar as she recalled that McCrea provided some information to the divers prior to the dive.  That McCrea provided a dive briefing was further supported by Chelsea's recollection that she heard McCrea say "I told them to say away from the rocks" while her father was in distress.  Chelsea Trial Tr. 5-132.  The Court also credits Smith's testimony that he provided a dive briefing to the divers.

58.  Based on the evidence adduced, the Court additionally finds that both Smith and McCrea provided inadequate dive briefings to Bill, Hambrook, and Nicolas.  The dive briefings should have included warnings about the hazardous conditions at

28

the dive site including the possibility of surge and waves at the dive site and instruction on how to navigate through an overhead environment.  The Court further finds that all of the foregoing hazards and dangers were known to Smith and McCrea.

59.  The Court deems it reasonable to infer and therefore finds that if Bill and Hambrook had been informed about the dangers associated with the dive site by either Smith or McCrea, they would have asked to go somewhere else without such dangers, such as the two dive sites visited by Bill and Nicolas the day before.  This inference is supported by Hambrook's testimony that she informed Smith that the family wanted easy, safe, and supervised diving.  Hambrook Trial Tr. 8-86.  The Court additionally finds that the inadequate dive briefings contributed to the chain of events leading to Bill's fatality, because he was unprepared to deal with the hazards he encountered, as discussed further below.  The Court further finds that Smith and McCrea enhanced the inherent risks and hazards associated with the dive through their failure to provide adequate briefings.

**E. Execution of Dive Plan**

60.  Given that Bill, Hambrook, and Nicolas were all three newly certified divers, it was foreseeable and reasonable that

29

Smith would be required to provide close supervision during the dive tour.  Weber Trial Tr. 5-52.  Weber testified that providing close supervision means staying within ten feet of the divers in order to be close enough to assist in the event of a problem.  Id. 5-59.

61.  After entering the water, Bill, Hambrook, and Nicolas descended together as a group along the mooring line.  Hambrook Trial Tr. 8-90.  Smith had already gone ahead and did not descend with Bill, Hambrook, and Nicolas.  Id.  Smith then met the divers at the bottom, signaled them to follow and proceeded to move off toward the shoreline.  Id.  Bill, Hambrook, and Nicolas followed but Smith was "way[] ahead of [them]."  Id.; Hambrook Trial Tr. 9-127.  Hambrook testified that Smith was about 20 feet away from them at this time.  Hambrook Trial Tr. 9-127.

62.  The Court heard conflicting testimony about what happened next.  Smith testified in his deposition that he stopped before entering Skull Cavern, looked back and saw Bill "drifting upwards," just as a set of five or more three to four foot waves arrived, and that a wave carried Bill over him.  Ex 178 (Smith Dep. Tr. 227, 240, 261).  According to Smith, at this time, Bill

was approximately 15 feet behind him.  Id. 227.  Smith testified that neither he nor Bill ever entered Skull Cavern.

63.  According to Nicolas, the divers started to head towards the opening at Skull Cavern with Smith in the lead. Nicolas Trial Tr. 2-121.  As they approached Skull Cavern, Nicolas testified that he did not believe there were any communications between the divers.  Id.  At this point, Nicolas witnessed Smith enter Skull Cavern, followed by his father, and as he followed them toward the opening, the water suddenly "felt like it was pulling [him] into the opening."  Id. 2-122.

64.  According to Nicolas, after he lost sight of Smith, he could still see his father inside Skull Cavern and his father appeared to be "[s]wimming forwards and upwards."  Id. 125.  The evidence presented regarding the interior topography of Skull Cavern uniformly described an upward slope when moving from the entrance toward the back under the skylight.  Weber Trial Tr. 5-21; Laros Trial Tr. 9-58-59; Gingo Trial Tr. 10-171.

65.  After he lost sight of his father, Nicolas was swept by the water to the entrance of Skull Cavern and had to push off the rock formations there.  Nicolas Trial Tr. 2-126-127. Nicolas testified that the water then changed directions and started pushing him out away from the opening.  Id. 2-127.  At

this point, he decided he was uncomfortable with the conditions and began to return to the mooring line.  Id.  It took 13-year-old Nicolas approximately one minute or less to reach the mooring line.  Id. 2-128.  According to McCrea's drawn map of the incident, the entrance of Skull Cavern was approximately eighty feet from the boat.  Ex. 331A (McCrea Map).

66.  Hambrook testified that shortly into the dive she was pushed by the force of the water and jostled and bounced to the bottom of the ocean, actually hitting the bottom.  Hambrook Trial Tr. 8-91.  Once she gained control, she noticed Bill drifting or washing away to her left.  Id.  Hambrook waved for Bill to come back.  Id. 8-92.  At that moment, she also saw Smith at or in one of the archway entrances to Skull Cavern. Id. 8-91.  Hambrook saw Nicolas turn and head back and she followed him.  Id. 8-92.  Hambrook testified that it took her approximately 30 to 40 seconds to return to the mooring line. Hambrook Trial Tr. 9-171-172.

67.  Smith testified that he noticed Hambrook and Nicolas swimming back towards the boat and that at this time they were "not more than 20 feet away" from him.  Smith Trial Tr. 2-16.

68.  On the boat, in the same timeframe described by Nicolas and Hambrook, Chelsea saw Bill on the rocks above Skull

Cavern, confused and disoriented, but with his mask on and regulator in his mouth.  Chelsea Trial Tr. 5-132.  Directly behind Bill was a "hole" that Chelsea was afraid he might fall into.  Id.

69.  McCrea testified that he saw Bill twice at the surface of the water.  The first time, McCrea saw Bill come to the surface and let air out of his BCD.  McCrea Trial Tr. 4-136. Bill appeared to be in control at this time and descended back under water.  Id.  Seconds later, McCrea saw Bill surface again, this time without his regulator in his mouth "thrashing about" and looking panicked.  Id. 4-105; Ex. 179 (McCrea Dep. Tr. 111-12).

70.  Chelsea, McCrea, and Smith observed Bill calling for help.  Chelsea Trial Tr. 5-134-135; Ex. 179 (McCrea Dep. Tr. 158); Ex. 178 (Smith Dep. Tr. 261).

71.  McCrea testified that Bill had his mask on the second time he saw him at the surface and Smith testified Bill had has mask on when he heard him call for help.  Ex. 179 (McCrea Dep. Tr. 114); Ex. 178 (Smith Dep. Tr. 260).  Chelsea testified that the last time she saw her father on the rocks he did not have "the regulator" or his "mask on his face."  Chelsea Trial Tr. 5-135.

72.   The Court heard testimony that the wave action at Skull Cavern can cause a diver to be pushed to the surface of the ocean.  Smith admitted that under certain conditions it would be possible for the hydraulic action at Skull Cavern to push someone to the surface.  Smith Trial Tr. at 2-100.  Laros testified that when the waves are high, it is possible for someone in Skull Cavern to get popped out to the top.  Laros Trial Tr. 9-58.  Weber similarly testified that surge around Skull Cavern can cause divers to be "shot up."  Weber Trial Tr. 5-37.

73.   The Hawaii Police Report for the subject incident contained a statement attributed to Smith, based on a police interview of Smith conducted the same day as the incident, stating, "SMITH related that a current surge suddenly swirled in the area and [Bill] went to the surface."  Trial Tr. 2-57; Ex. 125 (Hawaii Police Department Records), at 23.

74.   Laros confirmed and the Court observed that video footage taken by Laros less than an hour after the subject incident at the dive site showed some surge.  Laros Trial Tr. 9-64-65; Ex. 57 (Laros DVD).

75.   Defendants maintain that Bill lost buoyancy control, causing him to rise to the surface.  However, Smith did not

34

mention the loss of buoyancy control in his statement to the Hawaii Police, in his written statement submitted to the United States Coast Guard on the day of the incident, or in the PADI Incident Report submitted by Smith to PADI six days after the incident.  Smith Trial Tr. 2-59, 2-64; Ex. 6 (Coast Guard Statement dated April 11, 2012); Ex. 103 (Smith PADI Incident Report), at 1; Ex. 125 (Hawaii Police Department Records), at 23.

76.  After observing the demeanor and assessing the details of the testimony presented as well as all the evidence, the Court credits Nicolas's testimony and finds that Smith led Bill into Skull Cavern, just as a set of waves creating a strong surge arrived.  The Court notes that Hambrook testified that she did not observe Bill enter the arch at Skull Cavern.  Hambrook Trial Tr. 9-106.  However, it is reasonable to infer that at the time Bill entered Skull Cavern, as observed by Nicolas, Hambrook was experiencing the surge conditions that led her to be bounced to the bottom of the ocean, preventing her from seeing Bill at this time.

77.  The Court finds that based on Nicolas's and Hambrook's testimony, Smith swam ahead of the divers failing to stay sufficiently close to the divers to provide adequate

supervision.  Hambrook Trial Tr. 8-90, 9-127; Nicolas Trial Tr. 2-121-125.  This was particularly problematic given that Nicolas was a junior diver.  Smith also failed to assess the conditions under water prior to entering Skull Cavern.  In this respect, the Court credits Nicolas's testimony describing the sequence of events as the divers approached Skull Cavern and Bill and Smith went through the arches at the cavern, including his testimony that there were no communications during the approach.  Nicolas Trial Tr. 2-122-125.  These findings are also supported by Weber's expert report in which she noted that Smith erred by "not stopping, checking on the group, in addition to assessing/monitoring the environmental conditions."  Ex. 69 (Weber Report) at 9.  The Court finds that because Smith was too far ahead of Bill, he was unable to stop Bill from being swept to the surface of the water.

78.  The Court heard testimony on how a diver may be swept upward by the force of the hydraulic surge action in and around Skull Cavern, causing him or her to abruptly reach the surface of the water.  The Court finds that it can be reasonably inferred, based on all the evidence adduced, that after he entered Skull Cavern following Smith, Bill was swept upward by the surge to the surface of the water through the structure's

36

open skylight, washing him onto the shallow rocks just above, as observed by his daughter Chelsea.

79.  An alternative reasonable inference based on the evidence adduced is that after he entered Skull Cavern following Smith, Bill was swept back out of the cavern through one of the two arches with the receding surge of the first wave, placing him in the position described by Smith in his testimony outside the cavern entrance.  This would have occurred just before Bill was swept shoreward over Smith, who was then looking for Bill, into the shallow rocky area, by the next wave of the set.

80.  The Court finds that it is unnecessary to determine which of these two reasonable inferences is more accurate.  In either case, the Court finds that Bill was swept upward without warning to the surface by the wave and surge action, and not as a consequence of his having failed to operate his BCD properly, as Defendants allege.  The Court finds it significant that Smith's reports that were made right after the event said nothing about a loss of buoyancy and that McCrea believed Bill was in control of his BCD and his buoyancy when he ascended to the surface the first time and then proceeded to descend. Relatedly, the Court notes that the likely explanation for Bill reaching the surface a second time, after McCrea saw him for the

first time at the surface and in control of his BCD, was as a result of the wave and surge action he experienced.[5]

81.   Defendants point to Weber's testimony that Bill lost neutral buoyancy and surfaced.  Weber Trial Tr. 5-90. Obviously, when Bill was swept to the surface of the water, he lost neutral buoyancy.  However, as noted above, the Court finds that the cause of Bill reaching the surface was the wave and surge action, and not his inability to maintain buoyancy, as Weber also testified.  Id. 5-118 (noting that the waves and not buoyancy issues caused the problem).

82.   Based on all the evidence adduced, the Court finds it reasonable to infer that when Hambrook saw Bill being swept or

---

[5] During Closing Arguments, Smith and HSS argued that Plaintiff admitted in her Answer to their Counterclaim that Bill had issues with his buoyancy control.  Trial Tr. 12-16-17.  In the Counterclaim, Smith and HSS alleged that, "Upon information and belief, around the same time [that Hambrook and Nicolas headed back to the boat] Mr. Savage experienced difficulties maintaining neutral buoyancy underwater."  Counterclaim ¶ 12, ECF No. 166-1. In her Answer, Plaintiff admitted that Bill "was led by Smith into an area of wave action, surge, and current, and that he experienced difficulties that may have included buoyancy issues."  Answer to Counterclaim ¶ 6, ECF No. 167.  The Court notes that Plaintiff's answer can be interpreted in different ways, including that Bill had buoyancy problems related to the surge and the waves that he experienced, which caused him to be swept to the surface.

washed away, and her son swimming back to the boat, it was after the first wave of the set had passed.

83. The Court reiterates that there is a conflict in the testimony regarding the events that occurred with respect to the execution of the dive plan, including the supervision of the dive. The Court credits Hambrook and Nicolas's testimony over Smith's testimony, as discussed above.

84. The Court further finds that the danger created by the waves and surge on and around Skull Cavern as well as the change in depth associated with the cave, and the overhead environment, present greater risks than the inherent risks typically encountered in scuba diving, about which Bill, Hambrook, and Nicolas were given inadequate warnings.

85. Based on the evidence adduced, the Court additionally finds that Smith acted unreasonably in the execution of the dive plan, including his failure to adequately supervise the dive and his failure to assess the conditions at Skull Cavern prior to entering the arch. Smith also led Bill into Skull Cavern, which included an overhead environment and the presence of surge, although Bill did not have training for diving in an overhead environment.

86.   The Court additionally finds that in this respect, Smith enhanced the inherent risks and hazards associated with the dive.   The Court further finds that Smith's failure in this regard led to the circumstances which eventually resulted in Bill's death.

87.   The Court additionally finds that Bill acted unreasonably under the circumstances insofar as he followed Smith into the arch at Skull Cavern.   As noted above, while Bill, Hambrook, and Nicolas were PADI-certified divers, they had not received training regarding overhead environments. Specifically, the Open Water Diving Manual provided to Bill noted that overhead environments should be avoided unless specific training is received.   Ex. 11 (Open Water Diver Manual), at 139.   Engel additionally testified that he taught Bill, Hambrook, and Nicolas the information in the Open Water Diving Manual regarding the hazards of an overhead environment. Ex. 180 (Engel Dep. Tr. 200).

88.   Moreover, as part of Bill, Hambrook, and Nicolas's PADI training, they signed a PADI "Standard Safe Diving Practices Statement of Understanding," in which they agreed to: "Engage only in diving activities consistent with my training and experience.   Do not engage in cave or technical diving

40

unless specifically trained to do so." Ex. 232 (Maui Dive Company Records), at 9, 17, 30; Hambrook Trial Tr. 9-90-92.

89.  Nicolas testified that the divers were informed prior to the dive that they would be entering an opening that looked like the eye of a skull and Hambrook testified that they were informed they would be entering an archway.  Hambrook Trial Tr. 8-90, Nicolas Trial Tr. 2-120.  The Court has credited Nicolas's testimony that Bill in fact did enter the archway, following Smith through the entry of Skull Cavern.

90.  Given the contrary instructions Bill received, the Statement of Understanding he signed, and the information provided prior to the dive, he should have realized that entering the overhead environment at Skull Cavern could be dangerous and he should have considered that he was not trained to safely enter the cavern. The Court finds that Bill's negligent actions in this regard contributed to the circumstances resulting in his death.

**F. Recovery and Tow to Boat**

91.  After Bill was carried over him, Smith surfaced to try to help him.   He saw Bill on the surface in the whitewater caused by the waves, approximately 20 feet away, and he heard Bill yell "help me".  Smith Trial Tr. 1-113; Ex. 178 (Smith Dep.

Tr. 261).   Making a "bee line" to get to him as fast as possible, Smith swam to Bill and found him on the bottom at a depth of 12-15 feet.  Ex. 178 (Smith Dep. Tr. 259).  He had no mask on his face, and he did not have his scuba regulator in his mouth.  Id.  Smith estimated Bill was under water for about one minute before he reached him.  Id. 266.   Smith brought him to the surface, taking about 5 seconds to do so.  Id. 267.   At the surface, Smith saw that Bill's color was normal, and checking for breathing, Smith thought he "felt an exhalation."  Id. 268, 269.

92.   The boat was about fifty feet away from where Bill surfaced with Smith, according to McCrea's drawn map of the incident.  Ex. 331A (McCrea Map).  Smith testified that he towed Bill to the boat as fast as possible and estimated that it took one minute or less to do so.  Ex. 178 (Smith Dep. Tr. 270-71).  He estimated that it took him just a few more seconds to get Bill onto the swimstep of the boat with McCrea's assistance.  Id. at 273-74.  Nicolas testified that it took him about one minute to swim the eighty feet back to the mooring line from the entrance of Skull Cavern and Hambrook testified that it took her about 30 or 40 seconds to return to the mooring line after experiencing the surge.  Nicolas Trial Tr. 2-128; Ex. 331A (McCrea Map); Hambrook Trial Tr. 9-171-172.  Smith did not

42

provide rescue breaths while towing Bill back to the boat.  Id. 270.

93.  The Court heard conflicting evidence on the elapsed time in which Bill was under water, brought to the surface, to the vessel, and then aboard the vessel.  McCrea testified that the elapsed time for each of these segments was longer than Smith estimated.  McCrea's testimony on these points is directly contradicted by the handwritten PADI Incident Report that he prepared one day after this incident, in which he wrote, "Time elapsed from last sighting of victim until on board approx 4 minutes."  Ex. 18 (McCrea PADI Incident Report), at 4.  In his deposition, McCrea testified that from the time Smith surfaced with Bill until he got Bill to the boat, about a minute to a minute and a half elapsed.  Ex. 179 (McCrea Dep. Tr. 132, 223-24).  McCrea also acknowledged that given the lapse of three years, what he wrote in his contemporaneous PADI Incident Report was more accurate than his present recollection.  Id. 158-59.

94.  Having assessed the demeanor of the witnesses, the Court credits Smith's estimates, which establish that Bill was under water without his scuba regulator in his mouth for approximately one minute.  Further, that after Smith reached Bill, Smith brought him to the surface immediately (in

43

approximately 5 seconds), towed him to the boat in approximately one minute and then Smith and McCrea brought Bill aboard the boat immediately, in a matter of just a few more seconds.

95.   In sum, based on all the evidence adduced, the Court finds that a total time of approximately two to two-and-a-half-minutes elapsed from the time Bill was submerged unresponsive until he was actually brought aboard the boat by Smith and McCrea.

96.   The Court notes that the vessel logs and dive equipment, including a dive computer—which would have included information regarding the timing of the dive—were somehow missing.

97.   In 2012, the Diving Committee of the Undersea and Hyperbaric Medical Society ("UHMS") published an article titled Recommendations for Rescue of a Submerged Unresponsive Compressed-gas Diver in which the authors "reviewed available evidence in relation to medical aspects of rescuing a submerged unresponsive compressed-gas diver."  Ex. 59, at 1099.  Both Plaintiff and Defendants' medical experts discussed this article in their testimony.  The article refers to the "methods recommended" in the PADI Rescue Diver Manual as a "basis for discussion."  Id. at 1100.

98.  According to the article, "[t]here is ongoing debate over the optimal approach to rescue of an unresponsive diver from depth."  Id.  Because "[t]here is paucity of related research" the authors note that "any recommendations on rescue technique will defer largely to 'expert opinion.'"  Id.  The article provides several additional cautions with respect to its recommendations, including the following:

> First, any diver who becomes unresponsive underwater is in a perilous situation.  All divers must understand that even a textbook rescue will frequently not achieve a good outcome.  Interpretations of accidents and any commentary on the outcome of attempted rescues should therefore be made with great caution.
>
> Second, there are many contextual issues that could influence the correct course of action in any particular situation.  Although best evidence, logic and experience have been applied in answering the questions posed in the previous section, it is not claimed that these answers will invariably be correct in all situations.

Id. at 1101-1102.

99.  The authors determined that effective rescue breaths can be completed in the water, but noted that the "'breathe or remove from water decision' is very context sensitive, so the committee is reluctant to recommend directive 'rules' around these situations."  Id. at 1107.

100. The committee stated that:

45

> Its view on the matter is best summed up by the following statement: "Even when surfacing immediately adjacent to surface support, a trained rescuer should consider positioning the victim on the back, establishing positive buoyancy, opening the airway, and delivering two rescue breaths before initiating attempts to remove the victim from the water.  However, these steps can be set aside if circumstances suggest that removal of the victim from the water can be expedited in less than one minute."

Id.

101. Based on the evidence adduced, the Court finds that it was reasonable for Smith to tow Bill as quickly as possible to the boat, given the proximity to the boat, and to forego rescue breaths.  As stated in the UHMS article, if removal from the water is possible in less than one minute, the rescue diver may proceed to tow the victim to the boat where CPR can be initiated.

**G. Use of Oxygen, CPR, & Emergency Action Plan**

102. Smith testified that he and McCrea got Bill aboard the stern of the boat immediately, in a matter of just a few more seconds, there were another few seconds to move gear, and that McCrea began CPR as Smith started the engine, unmoored the boat, called 911, and piloted the boat to the harbor.  Ex. 178 (Smith Dep. Tr. 274-75).

103. There was testimony presented that Bill's face was of a purplish color at this time.  McCrea Trial Tr. 3-80; Chelsea Trial Tr. 5-145, 6-77; Hambrook Trial Tr. 8-97.

104. McCrea testified that as soon as all of the divers got back on board the vessel, he administered thirty chest compressions, then two rescue breaths, or mouth-to-mouth ventilations to Bill.  McCrea Trial Tr. 3-81; Ex. 179 (McCrea Dep. Tr. 124, 171).  He then continued CPR with 30 chest compressions and two breaths, providing both until they reached the mouth of the harbor at which point he continued with chest compressions only.  McCrea Trial Tr. 3-89.  McCrea estimated that it took between eight to ten minutes to return to the harbor.  Id. 3-90.

105. McCrea testified that he determined based on his training that Bill had no pulse, however he also testified that he did not check for a pulse.  McCrea Trial Tr. 3-89, 4-117. There was no evidence that Smith checked Bill's pulse.

106. Hambrook testified that McCrea only provided one or two rescue breaths to Bill and then performed only chest compressions.  Hambrook Trial Tr. 8-98-99.

107. The Hawaii Police Report for the subject incident included a written account of the information provided by

47

Hambrook to the police and noted that, "The cardiopulmonary resuscitation continued for approximately ten minutes as the boat, driven by [Smith], headed back toward the coast of Honokohau Harbor."  Ex. 125 (Hawaii Police Department Records), at 20-21.

108. After observing the demeanor and assessing the details of the testimony presented as well as all the evidence, the Court credits McCrea's testimony that he provided rescue breaths along with chest compressions up until reaching the mouth of the harbor.

109. PADI required that HSS have an oxygen unit available at any diving activity conducted by HSS.  Ex. 182 (Hornsby Dep. Tr. 93).  The United States Coast Guard did not require oxygen to be on board this type of vessel.  McCrea Trial Tr. 3-105.

110. Smith testified that he has three different oxygen tanks and two different oxygen masks available on his boat.  Ex. 178 (Smith Dep. Tr. 279).

111. Plaintiff's medical expert, Dr. Paul Cianci noted in his expert report that although there was a pocket rescue mask available on the boat, it was not utilized, even though it "would have aided greatly in the administration of rescue breaths and oxygen."  Ex. 76 (Cianci Report), at 3.  According

48

to Dr. Cianci, the use of the oxygen along with the pocket mask denied Bill a "vital element needed for survival."  Id. at 2-3. Dr. Cianci noted that "no additional assistance was rendered to Mr. McCrea, and he alone provided CPR."  Id. at 2.  He also stated that the administration of oxygen was a PADI recommendation and medically indicated and that "[d]espite Mr. McCrea's training, he failed to utilize this critical resuscitative measure."  Id. at 3.  At trial, Dr. Cianci testified that the use of "oxygen adds a whole order of magnitude of . . . oxygen available to the red cells to pick it up."  Cianci Trial Tr. 4-72.

112. Weber also testified regarding the importance of oxygen during the rescue situation at issue, noting that oxygen is appropriate in cases of resuscitation and "is almost always beneficial in a diving accident."  Weber Trial Tr. 5-70.  Weber also noted that rescue divers are trained on the use of oxygen during such incidents and stated that Smith and McCrea failed to provide "lifesaving oxygen" to Bill.  Id. 5-70-74; Ex. 70 (Weber Supplemental Report), at 5.  According to Weber, oxygen should have been used in this case, and McCrea should have gotten the oxygen ready to use once Bill surfaced and was being towed back to the boat by Smith.  Ex. 70 (Weber Supplemental Report), at 5.

49

Weber also noted that Smith left McCrea to "manage the accident scene" and "made no attempt to bring out the oxygen kit, nor direct someone else to retrieve it and make [it] available to [McCrea]."  Id.

113. The PADI Rescue Diver Manual provides that administration of oxygen is "one of the single most important first aid steps for a diver suspected of suffering from . . . near drowning."  Ex. 92 (PADI Rescue Diver Manual), at 29.

114. Despite the presence of oxygen on the boat and the importance of oxygen in near-drowning cases, it is undisputed and the Court therefore finds that Smith and McCrea did not provide rescue breaths to Bill with breathing oxygen carried aboard the HSS dive boat in accord with PADI Rescue Diver guidelines.

115. The Court further finds that given Bill's urgent need for oxygen therapy upon his recovery aboard the boat, Smith and McCrea should have immediately worked together to administer the oxygen and deliver chest compressions, before leaving Bill with one of them alone, leaving the mooring, and calling 911.  See Ex. 151 (The Responder), at PADI 001548 ("When rescuing a drowning victim of any age, it is reasonable for the lone healthcare provider to provide five cycles (about two minutes) of CPR before leaving the victim to activate the EMS system."); Ex. 92 (PADI

50

Rescue Diver Manual), at 39 ("If you have enough qualified Rescue Divers available, it's usually more effective for two rescuers to go to the victim's assistance."); Ex. 92 (PADI Rescue Diver Manual), at 185 ("Have someone open the [oxygen] kit while you continue rescue breaths and attach the oxygen tube from the continuous flow outlet to the pocket mask . . . . Don't let this interfere with rescue breathing or CPR procedures.").  On this basis, the Court rejects McCrea's justifications for not using the oxygen, i.e., because he could not administer the oxygen on the swim step alone while the boat was headed back to the harbor and because he claimed the oxygen could create a fire hazard given its proximity to the engine compartment.  See McCrea Trial Tr. 3-94, 3-99.

116.  Based on the evidence adduced, the Court finds that Smith and McCrea's failure to administer CPR with oxygen was unreasonable under the circumstances and contributed to Bill's fatality, as discussed further below.  The Court additionally finds that Smith and McCrea enhanced the inherent risks and hazards associated with the dive in this respect.

117. Relatedly, it is undisputed and the Court therefore finds that Smith did not have an Emergency Action Plan in place to provide for the foreseeable occurrence of a near-drowning

51

emergency such as in this case.  Ex. 178 (Smith Dep. Tr. 276-77); Ex. 179 (McCrea Dep. Tr. 258-59).  Smith and McCrea had not practiced or discussed procedures for such emergencies.  Ex. 179 (McCrea Dep. Tr. 259).

118. McCrea testified that he knew that oxygen was normally available on the boat but he did not physically look for the oxygen so he was not sure it was on the boat on the day of the incident.  Id. 99.  According to McCrea, he was aware of where the oxygen should have been kept, but on the day of the incident he made no attempt to see if the oxygen was actually present on board.  Id. 136.  Smith testified that on the day of the incident he never suggested to McCrea that oxygen was on board or that oxygen should be administered.  Ex. 178 (Smith Dep. Tr. 328).  The Court finds that McCrea should have inquired of Smith, prior to the vessel leaving on the dive trip, about emergency plan procedures; particularly since in accordance with the United States Coast Guard requirements, he would be serving as the captain of the vessel while Smith was leading the dive.

119. Weber testified that not having an Emergency Action Plan in place and not having practiced emergency procedures, including gaining familiarity with where the oxygen is located on a vessel, is inappropriate.  Weber Trial Tr. 5-74.  Gingo

testified that an Emergency Action Plan would at the least include the location of oxygen as well as the procedure to be used.  Gingo Trial Tr. 10-193-194.

120. Weber also noted that Smith and McCrea failed to provide a boat safety briefing, which would have provided information to the passengers regarding the location of the oxygen and first aid kit on board as well as the location of any flotation devices.  Ex. 70 (Weber Supplemental Report), at 4.

121. Based on the evidence adduced, the Court finds that Smith's failure to have in place and follow an Emergency Action Plan and McCrea's failure to inquire about emergency procedures were unreasonable.  The lack of a plan and the failure to discuss and practice emergency procedures left both Smith and McCrea unprepared with how to appropriately handle Bill's resuscitation, particularly because McCrea was not clear as to the location of the oxygen on the boat nor where the oxygen could be safely utilized.  The Court additionally finds that in this respect, Smith and McCrea enhanced the inherent risks and hazards associated with the dive.

122. Once the boat arrived at the boat harbor, Hawaii Emergency Medical Services ("EMS") was waiting and took over Bill's resuscitation and care.  Smith Trial Tr. 2-19-20; Ex. 124

(Emergency Medical Services Records).  Hambrook rode in the ambulance transporting Bill to Kona Hospital, where he was pronounced dead.  Hambrook Trial Tr. 8-100-101.

123. After autopsy, the Coroner's Inquest for the State of Hawaii, County of Hawaii, determined the cause of Bill's death was salt water drowning.  Ex. 125 (Hawaii Police Department Records), at 10.  The Court heard testimony from the parties' medical experts, who were also of the opinion that the cause of death was drowning, Cianci Trial Tr. 4-20-22; Weaver Trial Tr. 6-12 ("aspirated sea water"), and the Court so finds, based on all the evidence.

124. Dr. Cianci and Defendants' medical expert, Dr. Lindell Weaver, agree that there is a window of survivability after cessation of breathing that lasts a matter of minutes in near-drowning incidents, such as this case.  Cianci Trial Tr. 4-20-22 (five minutes); Weaver Trial Tr. 6-48 (two to three minutes).

125. While Dr. Cianci and Dr. Weaver have a high respect for one another, Dr. Cianci pointed out that Dr. Weaver's opinion was erroneously based on the conclusion that it took between "7.5 to 11 minutes" from the time Smith sank under water to the commencement of CPR.  Ex. 77 (Cianci Rebuttal Report), at 1; see also Ex. 241 (Weaver Report), at 5 (noting time range of

54

"7.5 to 11 minutes").  Dr. Cianci concluded that Bill would have survived the incident if appropriate resuscitative measures had been taken.  Cianci Trial Tr. at 4-12.  Dr. Weaver opined that, based on McCrea's testimony regarding the length of time it took for Bill to be retrieved from the ocean floor, he had already undergone cardiac arrest and rescue breaths and the administration of oxygen would have made no difference in his resuscitation.  Weaver Trial Tr. 6-13-14, 6-20.  Dr. Cianci disagreed with Dr. Weaver's conclusion that Bill had already gone into cardiac arrest.  He also explained that where cardiac arrest is due to drowning, the problem is that the heart has been "starved of oxygen."  Cianci Trial Tr. 4-73.  In these cases, oxygen "may provide the vital substrate for the heart to begin beating on its own or be in a more effective rhythm" and that when the "heart is in dire straits, providing oxygen will correct that situation."  Id.

126. Based on the testimony of Smith regarding the elapsed times and the testimony of Dr. Cianci and Dr. Weaver, the Court finds that if proper resuscitation procedures had been followed by Smith and McCrea, specifically the administration of CPR with oxygen once Bill had reached the boat, it is more probable than not that Bill would have survived.  Both Dr. Cianci and Dr.

Weaver agreed that a period of survivability for near-drowning victims lasts between two to five minutes.  Here, the Court finds Bill was under water, recovered by Smith, and towed back to the boat in a period of approximately two to two-and-a-half-minutes, within the periods of survivability described by both experts.  Moreover, the Court heard testimony on the critical importance of oxygen administration for near-drowning victims.

**V.    Findings Related to Claims Against PADI**

127. At the Pretrial Conference, Plaintiff stipulated that she had one narrow claim against PADI, i.e., that PADI was grossly negligent in following EFR's difference on compressions procedures in 2011.  Pretrial Tr. Conf. 90-91.

128. As noted above, EFR is a wholly owned subsidiary of PADI Americas, Inc.  Hornsby Trial Tr. 7-34, 7-41.  EFR provides first aid and CPR training to the public, including both the diving and nondiving community.  Ex. 182 (Hornsby Dep. Tr. 51). PADI Americas owns the copyright to PADI manuals and produces them, while EFR owns the copyrights to its EFR manuals.  Hornsby Trial Tr. 7-34-36.

129. In 2010, the American Heart Association ("AHA") and the European Resuscitation Council ("ERC"), members of the International Liaison Committee on Resuscitation ("ILCOR")

56

released new CPR guidelines.  Ex. 150 (PADI Training Bulletin), at PADI001856.  EFR and other CPR teaching organizations base their CPR guidelines on the guidelines passed down by local ILCOR members.  Shreeves Trial Tr. 7-25.  The new guidelines maintained the 30:2 compressions to ventilations ratio.  Ex. 150, at PADI001856.  The change in the 2010 guidelines most relevant to the instant case was a recommendation that individuals initiate chest compressions prior to rescue breaths. Shreeves Trial Tr. 7-26; Ex. 150, at PADI001857.  The changes to the AHA guidelines, as reported to PADI members, however, note that "if you suspect possible drowning, begin with CPR rescue breaths before chest compressions."  Ex. 150 (PADI Training Bulletin), at PADI001857.

130. In 2010 and 2011, through its newsletter titled "The Responder," EFR sent information to its instructors regarding upcoming changes to the EFR guidelines.  Ex. 151.  The 2010 quarter 4 Responder summarized the AHA's CPR changes, and included the recommendation that in "possible drowning" cases, CPR with rescue breaths should be administered before chest compressions.  Id. at PADI001543.

131. The 2011 quarter 1 Responder provided that according to the new guidelines from the AHA, "[u]ntrained bystanders

should provide compression only CPR for an adult victim who suddenly collapses or follow the directions of an EMS dispatcher." Id. at PADI001548. "Trained lay rescuers," however, "should continue to perform compressions and ventilations during CPR." Id.

132. The Responder also included a section entitled "Drowning-A Special Resuscitation Situation." Id. This section provided as follows:

> The 2010 AHA guidelines classified drowning as a special resuscitation situation that warrants additional recommendations. These recommendations support the current training curriculum for the PADI Rescue Diver course for inwater and out-of-water resuscitation and rescue breathing. For more information refer to the PADI *Rescue Diver* Manual or PADI *Instructor Manual*.
>
> Because the duration and severity of hypoxia sustained is the single most important determinant of outcome, rescuers should remove drowning victims from the water by the fastest means available and should begin resuscitation as quickly as possible. Inwater mouth-to-mouth ventilation may be helpful when administered by a trained rescuer.

Id. (footnotes omitted).

133. EFR issued a new instructor's manual following the revisions along with a student manual. Shreeves Trial Tr. 7-26. However, the PADI Rescue Diver Manual recommendations for rescue

58

of a submerged unresponsive diver have not been revised since at least 2006.  Id. 7-27.

134. Plaintiff's own experts, Dr. Cianci and Weber endorsed PADI guidelines.  Cianci Trial Tr. 4-55; Weber Trial Tr. 5-76. Dr. Cianci testified that McCrea and Smith should have followed the PADI guidelines but did not, and Weber testified that if McCrea and Smith had followed the PADI guidelines and protocols, she would have no issue with their rescue attempt.  Cianci Trial Tr. 4-55; Weber Trial Tr. 5-76.

135. Based on the evidence adduced and as discussed further below, the Court finds that despite Plaintiff's contention to the contrary, PADI did not act unreasonably with respect to the dissemination of EFR guidelines to its members.  PADI and EFR informed their instructors that although there would be changes to CPR guidelines, the guidelines provided in the PADI materials should be relied on for near-drowning victims.  Moreover, the materials distributed to PADI and EFR members included information that in drowning cases, rescue breaths should be administered prior to chest compressions.

**VI.  Pain and Suffering, Witnessing the Incident, Family Life, and Earning Capacity**

136. The Court finds that Bill was conscious of his impending death for a period of at least 1 to 2 minutes.  The

59

Court heard testimony on the physiological experience of death by drowning, during which the submerged victim holds his breath as long as he can (undoubtedly in great physical and emotional pain) and then involuntarily inhales water, leading to loss of consciousness and, ultimately, if proper rescue and resuscitation measures are not promptly taken, to heart and brain damage.  Cianci Trial Tr. 4-13-15.

137. Accordingly, the Court deems it reasonable to infer, and therefore finds, that while Bill's period of pre-death conscious pain and suffering may have been relatively short temporally, it was agonizing and frightful.

138. Hambrook testified that while McCrea was giving Bill chest compressions, she remained close to Bill's side, "telling him [she] loved him," that he "needed to wake up," "the kids loved him, and that [they] needed him to stay with [them]." Hambrook Trial Tr. 8-96.  Hambrook traveled with Bill in the ambulance back to the hospital and after the doctor informed her Bill did not have a chance of survival, she "said good-bye to him and [] held him."  Id. 8-102.

139. Nicolas testified that he witnessed his father's "unconscious body" being towed back to the boat.  Nicolas Trial Tr. 2-130.

60

140. Chelsea testified that she saw Smith tow her father back to the boat while he was unconscious and his face was a purple color.  Chelsea Trial Tr. 5-145, 6-76-77.  During the trip back to the harbor Chelsea saw her father's foot "hanging off the edge of the boat" and "bouncing in the water."  Id. 5-148.  She also testified that she and Nicolas waited at the hospital to hear about her father's condition, and that eventually, her mother informed them that her father "didn't make it."  Id. 5-153.

141. Based on the testimony adduced and the demeanor of the witnesses, the Court finds that Hambrook, Chelsea, and Nicolas, who were all present on the HSS dive boat while the failed resuscitation attempt proceeded, and who were also present at the Kona Hospital when Bill was pronounced dead shortly thereafter, suffered significant emotional distress.

142. The Court finds, based on the evidence, that Hambrook and Bill were well suited to each other as a couple and that they had a happy marriage.  See, e.g., Hambrook Trial Tr. 8-64-65, 8-66-67, 8-72-77.  The Court finds that Bill, only 49 years old the day he died, was a robust, fun-loving and industrious man, who was devoted to his family.  Id.

143. The Court finds, based on the evidence adduced, that Hambrook was 50 years old when she lost Bill and that she was very much in love and shared life's challenges and joys with Bill, cherishing the comfort and companionship he provided while he lived.

144. The Court finds, based on the evidence adduced, that Bill had a particularly close and loving relationship with his children, Chelsea and Nicolas.  See, e.g., Hambrook Trial Tr. 8-76-77, Nicolas Trial Tr. 2-135-137, Chelsea Trial Tr. 5-163-173. Further, that throughout their childhood, because Bill and Hambrook had made a decision together as a couple that her career would take precedence over his while the children were young, Bill was closely involved in their day-to-day activities. Id.  When their father died, Chelsea was 17 years old and Nicolas was 13.

145. The Court finds, based on the evidence adduced, that Bill was skilled in working with his hands and with tools. Further, that during the time his children were young he personally made improvements to the family homes that increased the properties' value each time, including fencing three acres, and grading their land at his last residence to produce an

62

enhanced "city lights" view.   Hambrook Trial Tr. 8-67-69, 8-71-76.

146. The Court finds, based on the evidence adduced, that Bill was also skilled in using construction tools, including chop saws, chain saws, skill saws, mitre saws, post pounders, drills, sanders, routers, and drill presses.   Ex. 66 (Male Rebuttal Report), at 3.   Bill also operated heavier construction equipment, including Skid Steers, Augers, Concrete Mixers, Backhoes, Front End Loaders, and Dump Trailers.   Id. at 2-3.

147. The Court finds, based on the evidence adduced, that in addition, to his "hands-on" skills, Bill also owned and operated a small business, Fringe Fencing and Sod, Ltd., where he worked initially on a part-time basis while the family was raising their children and Bill was supporting Hambrook's career development. See, e.g., Hambrook Trial Tr. 8-71, 8-111.

148. The Court notes that Plaintiff's economic damages expert, Dr. Robert Male, found in his report as follows, based on his review of relevant materials and communications with Hambrook:

> In the years just before this [sic] death, Mr.
> Savage chose to apply his time and skills
> (earning capacity) to developing the family home
> & property; acting as primary parent/homemaker
> while the children were younger so that Ms.
> Hambrook could focus on developing her career.

> Just before his death, Mr. Savage planned on developing and working at this business full time now that the children were older and self-sufficient.  He obtained Business licenses in Okotoks and High River in 2012 (copies in the file), developed a website, and had begun advertising.

Ex. 66 (Male Rebuttal Report), at 3.

149. The Court finds, based on the evidence adduced, that Bill's company's business activities included fencing and landscape work for a large-scale golf course and housing development project near Calgary.  Wilson Trial Tr. 4-176-179.

150. The Court further finds, based on the evidence adduced, that Bill had the capacity to earn an annual income of 60-75,000 Canadian dollars, if he chose to work as a foreman-supervisor of a landscaping company in his community of Alberta, Canada, as testified by Stephen Wilson ("Wilson").  Wilson Trial Tr. 4-181-184.  Wilson worked with Bill on a golf course project for three years starting in 2006, in which Wilson acted as a project manager and lead designer.  Id. 4-173-174.  The project required a variety of fencing, and Bill was hired to work on the fencing, which he did until 2008 or 2009.  Id. 4-173-175.  Bill also worked on landscaping associated with the project and was paid between 125,000-150,000 in Canadian dollars for his work.  Id. 4-179.

151. The Court also finds based on Dr. Male's expert report and testimony that if Bill had continued to work at and develop his business or if he had worked in a similar field, Bill had the capacity to earn an annual income of 64,416 in Canadian dollars.  Ex. 65 (Male Expert Report), at 4, 6; Male Trial Tr. 6-161-170.  Male's calculation of Bill's annual earning capacity was based on Bill's work skills and employment at the time of his death as well as "the average earnings of Handymen and Equipment Operators and the 10th percentile average earnings of Contractors in Okotoks, Alberta, Canada."  Ex. 65 (Male Expert Report), at 4.

### CONCLUSIONS OF LAW

Having evaluated the factual aspects of Plaintiff's claims, the Court will now make its conclusions of law.

### I.    Jurisdiction and Venue

1.    This Court has subject matter jurisdiction in admiralty pursuant to 28 U.S.C. § 1333, as noted in the Court's Summary Judgment Order.  See Jerome B. Grubert, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 532-34 (1995) (noting that to determine whether there is admiralty jurisdiction the court must consider (1) whether the tort occurred on navigable water, and (2) whether the incident has a "potentially

disruptive impact on maritime commerce" and the general character of the activity giving rise to the incident bears a "substantial relationship to traditional maritime activity").

2.   Here, there was no dispute that the incident occurred in navigable waters.  Summary Judgment Order, at 15.  Moreover, Plaintiff's claims involve allegations that resuscitation efforts on board the vessel were negligent, and the administration of first aid at sea has been found to be a traditional maritime activity.  Id. (citing In the Matter of the Complaint of Kanoa, Inc., 872 F. Supp. 740, 745 & n3 (D. Haw. 1994), overruling on other grounds recognized by McClenahan v. Paradise Cruises, Ltd., 888 F. Supp. 120, 123 (D. Haw. 1995); Courtney v. Pacific Adventures, Inc., 5 F. Supp. 2d 874, 878 (1998)); see also Sinclair v. Soniform, Inc., 935 F.2d 599, 602-03 (3d Cir. 1991) (finding that scuba diver's claim of negligence with respect to the administration of treatment for injury fell within admiralty jurisdiction where 1) the crew's activity affected maritime commerce because the vessel "was engaged in a commercial venture" and had the potential to impact maritime commerce because other vessels could have been called for help; and 2) the injuries at the heart of the claim of negligence involved the crew's "duty to provide adequate care to

66

an injured passenger" which relates "to a traditional goal of admiralty law"). Accordingly, admiralty jurisdiction applies.

3.  Venue is proper as the events that gave rise to this action occurred within this district, 28 U.S.C. 1391(b)(2).

## II.  Applicable Law

4.  In Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 206 (1996), the Supreme Court held that "[w]ith admiralty jurisdiction . . . comes the application of substantive admiralty law." (citation omitted).  However, the Court noted that "[t]he exercise of admiralty jurisdiction . . . does not result in automatic displacement of state law." Id. (citation omitted).

5.  Since Yamaha, courts have held that state law may be applied to supplement general maritime law as long as there is no conflict.  As noted in the Court's Summary Judgment Order,

> Since Calhoun, courts have generally found that state laws that do not conflict with general maritime law may be applied in the context of admiralty jurisdiction.  See Hawaii Stevedores, Inc. v. Island Cement, LLC, Civ. No. 09-00250 DAE-BMK, 2009 WL 3681875, at *4 (D. Haw. Nov. 3, 2009) ("Because Hawaii's assumpsit statute does not conflict with general maritime law, Haw. Rev. Stat. § 607-14 applies here under the 'maritime but local' doctrine."); 17A James Wm. Moore, et al., Moore's Federal Practice ¶ 124.46 (3d ed. 2009) (state law applies if not in conflict with general maritime law (citing Calhoun, 516 U.S. at 215-16)).

Summary Judgment Order at 17 n. 8.

6.   Courts have also held that consistent state law may supplement admiralty remedies for the death of nonseafarers in state territorial waters.  Matheny v. Tennessee Valley Authority, 503 F. Supp. 2d 917, 922 (M.D. Tenn. 2007) ("Under the Supreme Court's most recent line of cases, state law is to be applied where it 'fills gaps' or provides relief that otherwise would not be available under admiralty law; but, where state law would supersede or limit clearly defined maritime causes of action, it cannot be applied."); In re Air Crash at Belle Harbor, New York on Nov. 12, 2001, No. MDL 1448 (RWS), 2006 WL 1288298, at *15 (S.D.N.Y. May 9, 2006) ("Subsequent federal courts, consistent with the rationale of Yamaha, have allowed more generous state law to supplement the Moragne death action and rejected arguments by defendants that Yamaha requires application of state law even when that law is narrower than the Moragne cause of action.").

7.   Defendants claim that pursuant to The Tungus v. Skovgaard, 358 U.S. 588, 592 (1959), if Plaintiff seeks to recover under Hawaii Revised Statutes ("HRS") Chapter 663 (covering wrongful death actions), all of the provisions of the chapter should apply to their claims under Hawaii law.  In Tungus, the Court held:

68

> (I)f the admiralty adopts the statute as a rule
> of right to be administered within its own
> jurisdiction, it must take the right subject to
> the limitations which have been made a part of
> its existence. * * * The liability and the remedy
> are created by the same statutes, and the
> limitations of the remedy are therefore to be
> treated as limitations of the right.

Id. at 593 (alterations in original) (citation omitted).

8.   However, Tungus has been recognized as largely
overruled by Yamaha.  Specifically, in Calhoun v. Yamaha Motor
Corp., U.S.A., 216 F.3d 338, 349 (3d Cir. 2000), the Third
Circuit noted that the quotation cited to by Defendants from
Tungus was based upon the Supreme Court's Holding in The
Harrisburg, 119 U.S. 199 (1886).  The Third Circuit explained
that at the time The Harrisburg and The Tungus were decided "no
federal statute provided a cause of action for wrongful death in
territorial waters" and accordingly, these two cases suggested
that "such causes of action were to apply _state_ law liability
standards."  Id.  However, "[t]his principle, through which the
states remained a virtually equal participant in regulating the
means by which an individual could obtain relief for another's
death on the water, seemingly changed as a result of the Supreme
Court's opinion in Moragne v. States Marine Lines, Inc., 398
U.S. 375 (1970)," in which the Supreme Court created a federal

cause of action under common law for seamen killed in territorial waters.  Id.

9.   While the Third Circuit acknowledged that Tungus had not been expressly overruled, it determined that the significance of The Tungus has been narrowed:

> We believe that The Tungus remains good law only with respect to its broader proposition concerning the role that state regulation may play in the admiralty arena. The Supreme Court has lent credence to this broader proposition by authorizing the Calhouns' use of Pennsylvania's wrongful death/survival statute only as the vehicle through which they may prosecute their action.  The more specific holding of The Tungus, however—that federal courts must apply all facets of state law when a plaintiff seeks to proceed by way of a cause of action grounded in state law— was effectively overruled in Moragne once the Court invalidated the reasoning advanced by the Court in The Harrisburg.  The Tungus's emphasis on the usage of the particulars of state law was specifically trained on the fact that federal law (both statutory and common law) did not provide a cause of action for wrongful death on the water. This was the very precept that was universally struck down in Moragne, through which the Supreme Court created such a cause of action. As such, The Tungus's remaining vitality rests only upon the limited proposition announced by the Supreme Court earlier in this very litigation—that state law may provide a procedure or a vehicle through which a plaintiff may institute an action to remedy death in territorial waters.

Id. at 350 (emphases added); see also In re Antill Pipeline Const. Co., Inc., 866 F. Supp. 2d 563, 567 (E.D. La. 2011) ("Since Yamaha, it has become settled that, in many cases, state

70

law remedies can be accessed and applied by plaintiffs in non-seaman wrongful death actions to supplement those provided by federal maritime law. . . . However, fault and liability allocation has remained an issue governed by general federal maritime law in such actions.").  The Court agrees with these decisions.[6]

10.  The Court finds and concludes that Plaintiff may seek hedonic damages under Hawaii law to supplement her remedies available under maritime law.  State law on liability and limitations of damages that conflicts with and limits the relief available under federal maritime law should not be applied, however, consistent with the above discussion.

11.  In any event, as discussed further below, Defendants have not cited to a Hawaii law at issue here, which would change the Court's findings and conclusions in the instant case.

**III. Assumption of Risk, Waiver, and Releases**

12.  As noted in the Court's Summary Judgment Order, generally, assumption of risk has no place as a defense in

_____

[6] Defendants also rely on Pason v. Westfal-Larson Co., 504 F.2d 1226, 1229 (9th Cir. 1974), which quoted from The Tungus's holding recited above.  Pason, however, was decided prior to the Supreme Court's decision in Yamaha, which further explained the interaction between state law and federal law in wrongful death claims.

71

admiralty.   See, e.g., Simeonoff v. Hiner, 249 F.3d 883, 888 (9th Cir. 2001) ("We have held that in admiralty cases assumption of risk is not a defense and cannot be applied to bar or reduce damages sustained by seamen."); Skidmore v. Grueninger, 506 F.2d 716, 727 (5th Cir. 1975) ("Further, this Court has held that the doctrine of assumption of risk does not apply in maritime cases where seamen are not involved."); De Sole v. United States, 947 F.2d 1169, 1174 (4th Cir. 1991) ("The tenets of admiralty law, which are expressly designed to promote uniformity, do not permit assumption of risk in cases of personal injury whether in commercial or recreational situations.").[7]

13.   Even if the Court applied Hawaii law with respect to assumption of risk, the defense would not apply in the instant case.   In Hawaii, implied assumption of risk may serve as a complete defense "where the defendant's conduct at issue is an

---

[7] Courts "apply the doctrine of comparative fault" in admiralty cases as opposed to assumption of risk.   See Simeonoff, 249 F.3d at 888-89 (noting that assumption of risk is not a defense in admiralty law but "on the other hand" the doctrine of comparative fault is applicable); Skidmore, 506 F.2d at 725-27 (finding assumption of risk inapplicable in "maritime cases where seamen are not involved" but considering defense of contributory negligence).   The Court considers the issue of comparative fault below.

inherent risk of the sports activity." <u>Foronda ex rel. Estate of Foronda v. Hawaii Int'l Boxing Club</u>, 25 P.3d 826, 841 (Haw. Ct. App. 2001).  Notwithstanding, "[a] defendant may be held liable to the plaintiff for creating or countenancing risks other than risks inherent in the sport, or for increasing inherent risks." <u>Id.</u>  Here, as discussed further below, defendants Smith and McCrea increased the risks associated with the dive through their actions and inactions.  Smith failed to adequately supervise the dive and did not have a proper dive plan in place nor did he execute the dive plan appropriately. Both Smith and McCrea failed by providing inadequate dive briefings, not having proper emergency procedures in place, and by not working together to administer CPR along with oxygen to resuscitate Bill.  Moreover, the circumstances that led to Bill's death in the instant case, including the overhead environment, surge, breaking waves, and the depth change, presented a greater risk than the inherent risks typically encountered in scuba diving, which defendants did not adequately warn about.  Accordingly, implied assumption of risk would not apply, even under Hawaii law.

14.  With respect to the issue of waiver, the Court finds and concludes that the Release documents signed by Bill and

Hambrook purporting to waive negligence claims against Smith, HSS, and McCrea are unenforceable as a matter of admiralty law. In particular, 46 U.S.C. § 30509 applies to invalidate the Release with respect to these defendants.[8]

46 U.S.C. § 30509 provides in relevant part:

(a) Prohibition.--

(1) In general.--The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting--

(A) the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; or

(B) the right of a claimant for personal injury or death to a trial by court of competent jurisdiction.

(2) Voidness.--A provision described in paragraph (1) is void.

(b) Emotional distress, mental suffering, and psychological injury.--

---

[8] The Court previously determined in its Partial Summary Judgment Order that the statute did not invalidate the Releases as to PADI.  Summary Judgment Order, at 16.  The Court again finds and concludes that the statute does not invalidate the Releases as to PADI since PADI is not the owner, master, manager, agent, operator, or crewmember of the vessel.

(1) In general.--Subsection (a) does not
prohibit a provision in a contract or in ticket
conditions of carriage with a passenger that
relieves an owner, master, manager, agent,
operator, or crewmember of a vessel from
liability for infliction of emotional distress,
mental suffering, or psychological injury so long
as the provision does not limit such liability
when the emotional distress, mental suffering, or
psychological injury is--

(A) the result of physical injury to the
claimant caused by the negligence or fault of a
crewmember or the owner, master, manager, agent,
or operator;

(B) the result of the claimant having been
at actual risk of physical injury, and the risk
was caused by the negligence or fault of a
crewmember or the owner, master, manager, agent,
or operator; or

(C) intentionally inflicted by a crewmember
or the owner, master, manager, agent, or
operator.

The previous version of the statute, Section 183c,

similarly provided:

It shall be unlawful for the manager, agent,
master, or owner of any vessel transporting
passengers between ports of the United States or
between any such port and a foreign port to
insert in any rule, regulation, contract, or
agreement any provision or limitation (1)
purporting, in the event of loss of life or
bodily injury arising from the negligence or
fault of such owner or his servants, to relieve
such owner, master, or agent from liability, or
from liability beyond any stipulated amount, for
such loss or injury, or (2) purporting in such
event to lessen, weaken, or avoid the right of
any claimant to a trial by court of competent

75

jurisdiction on the question of liability for
such loss or injury, or the measure of damages
therefor.  All such provisions or limitations
contained in any such rule, regulation, contract,
or agreement are declared to be against public
policy and shall be null and void and of no
effect.

The two versions of the statute are not substantively distinct

with respect to the claims at issue here.

15.  Notably, 46 U.S.C. § 30502 states that "[e]xcept as

otherwise provided," Chapter 305, which includes § 30509,

"applies to seagoing vessels and vessels used on lakes or rivers

or in inland navigation, including canal boats, barges, and

lighters."

16.  In Pacific Adventures, 5 F. Supp. at 880, this

district court held that Section 183c applied to a release for

personal injuries in the context of a scuba diving excursion.

Pursuant to Pacific Adventures, and as noted in the Court's

Summary Judgment Order, Section 30509 applies to this admiralty

action and "generally bars releases of liability for personal

injuries [or death] arising out of negligence."  Summary

Judgment Order, at 15-16; see also Pacific Adventures, 5 F.

Supp. at 879 (noting that "[s]ection 183c is not limited to

common carriers but applies to 'all vessels used on lakes or

rivers or in inland navigation, including boats, barges, and lighters'" (quoting 46 U.S.C. § 188 (recodified at § 30502)).

17.  Section 30509 applies to owners, masters, managers, and agents of vessels.  There is no dispute that Smith and HSS operated and owned the vessel at issue.  Accordingly, the Court finds and concludes that the Releases at issue are invalid as to Smith and HSS.

18.  With respect to McCrea, the Court finds and concludes that McCrea was an agent of the vessel or vessel owner such that the statute applies to invalidate the Releases as against him. In Pacific Adventures, this district court considered the defendant's argument that Section 183c did not apply to invalidate the release against him because he was a diving guide and deckhand on the vessel at issue, but was not the agent of the vessel's owner.  5 F. Supp. 2d at 880.  The court held that to establish agency for purposes of Section 183c: "first, the principal must exercise significant control over the agent's activities, and, second, the agent must be engaged in conducting the business of the principal."  Id. at 880-881.  The court rejected the dive guide's contention that as a matter of law, he was a non-agent independent contractor.  Id. at 881.  In this respect, the court noted that the defendant acted as both a

77

deckhand and a dive guide, and that he conceded that in dropping the anchor prior to the dive, the vessel owner "had the right to control [his] conduct." Id. Thus, the court determined that the dive guide's duties were "not limited to providing a service to another without supervision." Id.

19. Here, McCrea testified that he was an independent contractor for Smith, but he conceded that while serving as a captain on the vessel he was under Smith's control. Ex. 179 (McCrea Dep. Tr. 27, 29). McCrea additionally agreed that while working for Smith, he accepted the fact that Smith "would tell [him] what to do." Id. 30. Thus, the Court finds and concludes that Smith exercised significant control over McCrea. It is also clear that McCrea was "engaged in conducting the business of" Smith given that he was hired by Smith to assist him during the scuba diving excursion. See Pacific Adventures, 5 F. Supp. 2d at 881. McCrea's responsibilities on the day of the dive included mooring the boat, assisting with loading the equipment on the boat and launching the boat, and, as required by United States Coast Guard regulations, serving as boat captain while Smith was in the water. As noted above, McCrea also provided a dive briefing on the day of the incident. Accordingly, the Court finds and concludes that McCrea acted as Smith's and HSS's

agent on the day of the incident.  The Court further finds and concludes that McCrea, in his aforesaid services as captain while Smith was in the water, also was the manager and master of the vessel.  On this basis, the Court finds and concludes that Section 30509 operates to invalidate the Releases as to McCrea.

20.  The Court also concludes that the Release documents are unenforceable even if Hawaii law governs this issue.  Hawaii Revised Statutes ("HRS") § 663-1.54 titled "[r]ecreational activity liability" provides:

> (a) Any person who owns or operates a business providing recreational activities to the public, such as, without limitation, scuba or skin diving, sky diving, bicycle tours, and mountain climbing, shall exercise reasonable care to ensure the safety of patrons and the public, and shall be liable for damages resulting from negligent acts or omissions of the person which cause injury.
>
> (b) Notwithstanding subsection (a), owners and operators of recreational activities shall not be liable for damages for injuries to a patron resulting from inherent risks associated with the recreational activity if the patron participating in the recreational activity voluntarily signs a written release waiving the owner or operator's liability for damages for injuries resulting from the inherent risks.  No waiver shall be valid unless:
>
> (1) The owner or operator first provides full disclosure of the inherent risks associated with the recreational activity; and

(2) The owner or operator takes reasonable steps to ensure that each patron is physically able to participate in the activity and is given the necessary instruction to participate in the activity safely.

(c) The determination of whether a risk is inherent or not is for the trier of fact. As used in this section an "inherent risk":

(1) Is a danger that a reasonable person would understand to be associated with the activity by the very nature of the activity engaged in;

(2) Is a danger that a reasonable person would understand to exist despite the owner or operator's exercise of reasonable care to eliminate or minimize the danger, and is generally beyond the control of the owner or operator; and

(3) Does not result from the negligence, gross negligence, or wanton act or omission of the owner or operator.

21.   The Standing Committee that drafted Section 663-1.54

explained its purpose as follows:

> Your Committee finds that this measure is necessary to more clearly define the liability of providers of commercial recreational activities by statutorily invalidating inherent risk waivers signed by the participants. Your committee further finds that these inherent risk waivers require providers to disclose known risks to the participant, but these waivers do not extend immunity to providers for damages resulting from negligence.  Thus, it is the intent of your Committee that this clarification in the law will appropriately reduce frivolous suits without increasing risks to participants.

Haw. Stand. Comm. Rep. No. 1537, 1997 Senate Journal, at 1476;

see also King v. CJM Country Stables, 315 F. Supp. 2d 1061, 1067

(D. Haw. 2004) (providing detailed analysis of legislative

history of § 663-1.54).

22.   Thus, Section 663-1.54 precludes any waiver of

liability for negligence against the owner or operator of a

business providing recreational activities, including scuba

diving excursions, and only permits waivers for damages

resulting from "inherent risks" that have been fully disclosed

to the customer.   See King, 315 F. Supp. 2d at 1067.

23.   The Court finds and concludes that because both Smith

and McCrea provided "recreational activities to the public," the

statute applies.   See HRS § 663-1.54(a).   Smith owned and

operated HSS, a business providing scuba diving experiences to

the public.   McCrea operated the business of HSS and Smith,

including by serving as a captain on the boat while Smith was in

the water as required by the United States Coast Guard,

providing a dive briefing to the divers (as the Court has found

above), and assisting the divers to enter the water.

24.   Here, as the Court previously found, Smith and McCrea

did not inform Bill, Hambrook, or Nicolas regarding the

particular risks and dangers associated with the Skull Cavern

dive site, including the hazards related to surge, waves, and diving in an overhead environment.  In addition, as noted above, these dangers presented a greater risk than the inherent risk typically encountered in scuba diving.  Moreover, there was no Emergency Action Plan in place or implemented by Smith, which left McCrea without any concrete knowledge as to the location of the oxygen on the vessel.  Relatedly, McCrea failed to check with Smith regarding emergency procedures prior to the vessel leaving for the dive site.  Smith also failed to appropriately execute the dive plan and adequately supervise the dive, as discussed further below.  Accordingly, Smith and McCrea contributed to enhancing the inherent risks associated with the activity at issue.

25.  In summary, Smith and McCrea 1) failed to "provide[] full disclosure of the inherent risks associated with the" dive; 2) failed to "take[] reasonable steps to ensure" the divers were "physically able to participate in the activity"; 3) did not give the divers "the necessary instruction to participate in the activity safely"; and 4) did not take "reasonable care to eliminate or minimize the danger."  See HRS § 663-1.54(b)(1)-(b)(2), (c)(2).  In addition, the dangers associated with the dive resulted from Smith and McCrea's negligence, and the risks

of the particular dive presented a greater risk than the inherent risk typically encountered in scuba diving.  See id. (c)(1), (c)(3).  For all of these reasons, the Releases at issue in the instant case are invalid under Hawaii law pursuant to HRS § 663-1.54(b) and (c), even assuming Hawaii law applies.

## IV.  Negligence Claims

26.   "[F]ederal courts have authority to develop a *substantive* body of *general maritime law* applicable to cases within the admiralty and maritime jurisdiction."  Sutton v. Earles, 26 F.3d 903, 912 (1994) (alterations in original) (citations omitted).  "The general maritime law affords redress for injuries and damage caused by negligence."  Id. (citation omitted).

27.   To recover for negligence under maritime law, Plaintiff must establish duty, breach, causation, and damages.  Samuels v. Holland Am. Line-USA Inc., 656 F.3d 948, 953 (9th Cir. 2011).  The owner of a vessel owes a duty of reasonable care to all passengers.  Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630 (1959).  "The degree of care required is always that which is reasonable, but the application of reasonable will of course change with the circumstances of

each particular case." In re Catalina Cruises, Inc., 137 F.3d 1422, 1425 (9th Cir. 1998).  As explained by the Ninth Circuit,

> What is required . . . is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger, or the greater responsibility, is merely one of the circumstances, demanding only an increased amount of care.  In some instances, reasonable care under the circumstances may be a very high degree of care; in other instances, it may be something less.

Id. (alteration in original) (quoting Rainey v. Paquet Cruises, Inc., 709 F.2d 169, 170–71 (2d Cir. 1983)).

28.  The Ninth Circuit has previously recognized a duty to rescue in admiralty law cases.  See Walsh v. Zuisei Kaiun K. K., 606 F.2d 259, 262 (9th Cir. 1979) (holding owner of vessel owed duty of rescue to the vessel's pilot even though the owner was not negligent with respect to the accident that led to the need for a rescue).

29.  Under Hawaii law, a plaintiff claiming negligence must prove by a preponderance of evidence: 1) "A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks"; 2) defendant's failure to "conform to the standard required"; 3) "[a] reasonably close causal connection between the conduct and the resulting injury"; and 4)

loss or damage.  Knodle v. Waikiki Gateway Hotel, Inc., 742 P.2d 377, 383 (Haw. 1987) (first alteration in original) (quoting W.P. Keeton, Prosser and Keeton on the Law of Torts § 30, at 164-65 (5th ed. 1984)).

30.  Generally, a person owes a duty of care to all foreseeable plaintiffs "subjected to an unreasonable risk of harm by the actor's negligent conduct."  Seibel v. City and County of Honolulu, 602 P.2d 532, 536 (Haw. 1979).  "[I]t is not necessary that the exact manner of the accident or injury be foreseeable."  Okada v. State, 614 P.2d 407, 408 (Haw. Ct. App. 1980) (citing Restatement (Second) of Torts § 435(1) (1965)).  The test of what is reasonably foreseeable is "whether 'there is some probability of harm sufficiently serious that [a reasonable and prudent person] would take precautions to avoid it.'"  Knodle, 742 P.2d at 385 (alteration in original) (citation omitted).  "In determining the existence of a duty, the court must consider whether the relationship between the parties is such that 'the community will impose a legal obligation upon one for the benefit of the other.'"  Futi v. United States, No. 08-00403 JMS/LEK, 2010 WL 2900328, at *18 (D. Haw. July 22, 2010) (quoting Knodle, 742 P.2d at 385)).

31.  An "actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability."  Restatement (Second) of Torts § 431 (1965).

32.  The Court determines that PADI's guidelines, recommendations, and requirements—contained for example in its training materials—establish what a reasonably prudent divemaster and rescue diver, should follow.  See, e.g., Gingo Trial Tr. 10-196; Cianci Trial Tr. 4-55; Weber Trial Tr. 5-76. This is particularly so in the instant case, given that Smith and McCrea were certified by and received some of their training through PADI.

33.  The Court finds and concludes that Smith and McCrea had a duty of reasonable care for the safety of their customer divers—namely Bill, Hambrook, and Nicolas—and that they breached their duty, legally causing Bill's death.

**V.   Negligence Claims Against Smith/HSS**

**A. Selection of Dive Site**

34.  As noted in the Court's findings of fact, the Court finds that Smith acted reasonably in his selection of the dive site, insofar as the divers were going to look at but not enter

86

the arches at Skull Cavern.  The Court heard substantial
evidence that the dive site is commonly frequented by
inexperienced certified divers, and the Franko Map describes the
dive as appropriate for beginners.  Accordingly, the Court finds
and concludes that Smith did not breach his duty of care in
selection of the dive site and was therefore not negligent in
this respect.

### B. Assessment of Environmental Conditions

35.   The Court has also found that Smith acted reasonably
with respect to assessing the ocean and weather conditions at
the dive site prior to starting the incident dive.  The Court
heard substantial evidence that the conditions were appropriate
for diving with waves approximately one to two feet, sunny
skies, and mild wind.  Smith testified that he observed the wave
sets before arriving at the dive site and that when he arrived,
he stayed on the boat for about ten minutes prior to the dive,
allowing him to assess the conditions during this time.  Ex. 178
(Smith Dep. Tr. 242-43).  McCrea also assessed the water
conditions while he was under water mooring the boat, and agreed
with Smith that the conditions were appropriate for diving.
McCrea Trial Tr. 3-65-66.  Accordingly, the Court finds and
concludes that Smith did not breach his duty of care with

respect to assessing the environmental conditions prior to starting the incident dive and was therefore not negligent in this respect.

### C. Dive Plan

36.   The Court has found that Smith's dive plan was unreasonable.  Smith testified that his dive plan included swimming up to the arches at Skull Cavern, assessing the conditions once he arrived at the arches, and entering the arches if the conditions were appropriate.  Ex. 178 (Smith Dep. Tr. 228); Smith Trial Tr. 2-78.  Moreover, the evidence indicated that the arches at Skull Cavern are considered overhead environments.  There was also evidence that diving in an overhead environment requires specialized training, which Bill, Hambrook, and Nicolas did not have, and Smith was informed of their experience level prior to selecting the dive site.  See Gingo Trial Tr. 10-197; Ex. 180 (Engel Dep. Tr. 200); Ex. 11 (Open Water Diver Manual), at 139; Hambrook Trial Tr. 8-86. There was also evidence that entering the arches at Skull Cavern can be dangerous because of the surge and wave sets at the site. Ex. 69 (Weber Report), at 8.  Given the particular dangers associated with entering the arches at Skull Cavern and the level of experience of the divers, including the fact that

88

Nicolas was a 13-year-old junior diver and the divers did not have training in diving in an overhead environment, the Court finds and concludes that Smith breached his duty of reasonable care.

37.   The Court further finds that Smith's breach was a legal cause of Bill's death.  Bill would not have experienced the surge and wave conditions that caused him to be swept to the surface, eventually leading to his drowning, if the dive plan had not involved entry into the arches at Skull Cavern.  The overhead environment also contributed to the fatality as Bill did not have training or instruction on how to navigate through the overhead environment and thus was unprepared to deal with the related hazards.  The Court therefore finds that Smith was negligent with respect to his creation of the dive plan.  The Court also reiterates its finding that Smith enhanced the inherent risks and hazards associated with the dive through his negligence.

### D. Dive Briefing

38.   As noted in the Court's findings of fact, the Court finds that Smith gave an inadequate dive briefing to Bill, Hambrook, and Nicolas prior to the dive and the Court finds and concludes that as a result, Smith breached his duty of

reasonable care.  Smith testified that he told the divers to avoid whitewater, which may look like champagne bubbles and that they should not swim towards it.  However, this information was insufficient.  Indeed, Smith admitted that he did not warn the divers specifically about the possibility of surge at the dive site and that he did not warn about wave sets, although wave sets are a foreseeable occurrence in Hawaii and on the Kona coast.  Smith also did not provide sufficient warnings about how to navigate through an overhead environment and how to deal with the change in depth associated with the site.  Both Plaintiff's expert and Defendants' expert provided testimony suggesting that a reasonably prudent divemaster would have warned about these conditions.  Weber Trial Tr. 5-62-63; Ex. 69 (Weber Expert Report), at 6; Gingo Trial Tr. 10-173-174, 10-196, 10-201-205.

39.  The Court has also found that if Bill and Hambrook had been informed about these dangers, they would have chosen to go to a different dive site.  Moreover, as the Court has found, the inadequate dive briefings contributed to the fatality because Bill was unprepared to deal with the hazardous conditions he encountered at the arches at Skull Cavern.  Accordingly, the Court finds and concludes that Smith's failure to provide an adequate dive briefing was a legal cause of Bill's death.  The

90

Court therefore finds and concludes that Smith was negligent in his failure to provide an adequate dive briefing in the instant case.   The Court reiterates its finding that in this respect, Smith enhanced the inherent risks and hazards associated with the dive.

### E. Execution of Dive Plan

40.   The Court finds and concludes that Smith breached his duty of reasonable care with respect to the execution of his dive plan and the supervision provided during the incident dive. In particular, Smith did not follow his plan to assess the environmental conditions prior to entering the arches at Skull Cavern, including the presence of surge, and he failed to closely monitor the inexperienced divers during the dive. Smith's lack of close supervision of the divers resulted in his inability to rescue Bill before he reached the surface.   Smith also led Bill into Skull Cavern, which included an overhead environment and the presence of surge, even though Smith knew Bill had not received training for diving in an overhead environment.

41.   As a consequence of Smith's failure in this regard, Bill was caught up in the surge once he entered Skull Cavern and was swept to the surface of the water.   Accordingly, the Court

finds that Smith's breach was a legal cause of Bill's death. The Court therefore finds and concludes that Smith was negligent with respect to the execution of the dive plan and in failing to adequately supervise the incident dive.  The Court reiterates its finding that Smith enhanced the inherent risks and hazards associated with the dive through his negligence.

### F. Recovery and Tow to Boat

42.  The Court has found that it was reasonable for Smith to forego providing Bill with rescue breaths while towing him back to the boat.  The UHMS article provides several qualifications to its recommendations that rescue breaths be given in the water, including that the decision to provide rescue breaths in the water is context sensitive.  Ex. 59 (UHMS Article), at 1107.  The article notes that where removal from the water is possible within less than one minute, a rescuer may proceed to tow the victim to the boat without providing rescue breaths.  Id. 1107.  Both Dr. Cianci and Dr. Weaver testified that they were familiar with most of the authors of the article and largely agreed with the recommendations made in the article.[9]

_____

[9] Dr. Cianci disagreed with a statement that "rescue and resuscitation of an unresponsive diver from depth is frequently unsuccessful," noting that "the literature is replete with
(continued . . . )

92

Cianci Trial Tr. 4-24-26, 4-29-37; Weaver Trial Tr. 6-21-31, 6-32-39.

43.   Here, Smith testified that it took him one minute or less to tow Bill to the boat—a distance of about fifty feet, according to McCrea.  Ex. 178 (Smith Dep. Tr. 270-71); Ex. 331A (McCrea Map).  This estimate was supported by the testimony that it took 13-year-old Nicolas about one minute to swim back to the mooring line from the entrance of Skull Cavern, which was about eighty feet away from the boat and mooring line.  Nicolas Trial Tr. 2-128; Ex. 331A (McCrea Map).  Hambrook also testified that it took her about 30 or 40 seconds to return to the mooring line after she experienced the surge.  Hambrook Trial Tr. 9-171-172.  Smith estimated that it took only a few seconds to get Bill onto the swimstep of the boat.  Id. at 273-74.  Under these circumstances, the Court finds and concludes that Smith did not breach his duty of care by not providing rescue breaths while towing Bill back to the boat.  Accordingly, the Court concludes

_____

( . . . continued)

divers who have been rescued from depth who've done well."  Cianci Trial Tr. 4-37.  Dr. Weaver testified that a study cited to in the article was done in a pool, with mannequins, and with highly trained individuals, and questioned the applicability of the study to the instant case.  Weaver Trial Tr. 6-42-43.

that Plaintiff failed to prove by a preponderance of the

evidence that Smith was negligent in this respect.

### G. Use of Oxygen, CPR, & Emergency Action Plan

44.  As noted in the Court's findings of fact, the Court

finds that once Bill was aboard the boat, Smith and McCrea

should have worked together to administer CPR in conjunction

with oxygen therapy to Bill as they learned in their training,

and as instructed by PADI, prior to returning to the boat

harbor.  Smith testified that there were three oxygen tanks and

two oxygen masks on board the day of the incident.  Ex. 178

(Smith Dep. Tr. 279).  However, instead of assisting McCrea with

Bill's resuscitation using the oxygen, Smith took control of the

boat and left McCrea on his own to attempt to resuscitate Bill.

Given that the boat was approximately eight to ten minutes from

the harbor and Bill was in dire condition, this decision was

unreasonable.  The Court notes that McCrea testified he did not

check Bill's pulse, and there was no evidence that Smith checked

Bill's pulse.  McCrea Trial Tr. 3-89, 4-117.  Smith also acted

unreasonably in his failure to have and to implement an

Emergency Action Plan.  Because there was no plan in place,

McCrea was unaware of the location of the oxygen on board the

boat and was similarly unfamiliar with the appropriate place to

administer the oxygen on the boat.  Smith also failed to instruct McCrea to use oxygen during Bill's resuscitation and failed to instruct him as to where the oxygen was located. Accordingly, the Court finds and concludes that Smith breached his duty of reasonable care with respect to assisting in the administration of oxygen during Bill's resuscitation and in his failure to have in place and implement an Emergency Action Plan.

45.  The Court finds and concludes that these failures were a legal cause of Bill's death.  The Court heard testimony that there is a window of survivability for drowning victims that lasts between two five minutes, and the boat was eight to ten minutes away from the harbor, indicating that time was of the essence.  Cianci Trial Tr. 4-20-22; Weaver Trial Tr. 6-48.  The Court has also heard testimony and evidence regarding the critical importance of oxygen administration for near-drowning victims and all of the evidence, including PADI sources indicated that oxygen is "one of the single most important" resuscitative measures in these cases.  See Ex. 92 (PADI Rescue Diver Manual), at 29.  Based on this evidence, the Court finds and concludes that Smith and McCrea's failure to together use the oxygen on the boat in conjunction with CPR to attempt to resuscitate Bill, which was influenced by the failure to have in

95

place and implement an Emergency Action Plan, was a substantial factor leading to Bill's death.  The Court therefore concludes that Smith was negligent in this respect.  The Court reiterates its finding that Smith enhanced the inherent risks and hazards associated with the dive through his negligence.

### H. HSS Liability

46.   The Court notes that HSS was the dive company in charge of planning and implementing the scuba dive and Smith acted and operated on behalf of HSS on the day of the dive, making HSS liable for Smith's related negligence.  The Court finds and concludes that Smith was acting within the scope of his authority as captain and divemaster at the time of the subject accident.  The Court additionally notes that Smith is the sole proprietor of HSS.  Smith Trial Tr. 1-59.  For all of these reasons, HSS is liable for Smith's negligence and is subject to joint and several liability as discussed further below.

## VI.   Negligence Claims Against McCrea

### A. Dive Briefing

47.   The Court has found that McCrea gave an inadequate dive briefing to Bill, Hambrook, and Nicolas.  As the Court noted above, Hambrook testified that McCrea provided a short

dive briefing and told the divers to stay low in the water and that they would follow Smith toward shore and "go through an archway on the right."  Hambrook Trial Tr. 8-90, 9-120.  Nicolas recalled someone giving a dive briefing that included a warning to avoid surface water, stay at depth, and that they would be entering an opening that looked like the eye of a skull; and Chelsea recalled that she heard McCrea say, "I told them to stay away from the rocks" while her father was in distress.  Nicolas Trial Tr. 2-120, 2-173-174; Chelsea Trial Tr. 5-132.  Although McCrea was not serving as divemaster on the day of the incident dive, the Court concludes that once he took on the responsibility of providing a dive briefing, he was required to provide an adequate dive briefing to comport with his duty of reasonable care.  As with Smith, McCrea did not warn about the particular hazards associated with the dive site.  The Court also notes that McCrea was unaware of the experience level of the divers, leaving him unprepared to provide appropriate briefing commensurate with the divers' skill level.  See Ex. 179 (McCrea Dep. Tr. 149).  On these bases, the Court finds and concludes that McCrea breached his duty of care in this regard.

48.  The Court has also found that if Bill and Hambrook had been informed about these dangers, they would have chosen to go

to a different dive site.  Moreover, as noted above, the inadequate dive briefings contributed to the fatality because Bill was unprepared to deal with the hazardous conditions he encountered at the arches at Skull Cavern.  Accordingly, the Court finds and concludes that McCrea's failure to provide an adequate dive briefing was a legal cause of Bill's death.  The Court therefore finds and concludes that McCrea was negligent in his failure to provide an adequate dive briefing in the instant case.  The Court reiterates its finding that in this respect, McCrea enhanced the inherent risks and hazards associated with the dive.

### B. Use of Oxygen, CPR, & Emergency Procedures

49.   As noted above, Smith and McCrea acted unreasonably in their failure to work together to provide CPR and use the oxygen available on board to resuscitate Bill.  The Court rejects McCrea's reasoning for not using the oxygen, i.e., that he could not apply it on the swim step while the boat was moving and that he was concerned about the use of the oxygen while the engine was running.  The Court has found that Smith and McCrea should have administered the oxygen prior to making the trip back to the harbor, in which case these concerns would not be relevant. The Court reiterates its earlier conclusion that oxygen is a

critical means of resuscitation.  Moreover, as discussed above, given the survivability window of two to five minutes as explained by the experts, and the fact that the boat was eight to ten minutes away from the harbor, there was a need for immediate care prior to reaching the boat harbor.  The Court also notes that McCrea believed there was oxygen on board and thus, should have located the oxygen and had it ready on the swimstep as soon as it became apparent that Bill was having trouble.  <u>See</u> Ex. 70 (Weber Supplemental Report), at 5.

50.  McCrea's failures with respect to emergency procedures also contributed to the unreasonable resuscitation attempt. McCrea admitted that he was unclear as to the location of the oxygen on board and had not confirmed that oxygen was actually available on the day of the incident dive.  The Court finds and concludes that McCrea should have consulted with Smith regarding emergency procedures prior to leaving the harbor for the dive site, and he should have become familiar with such procedures, particularly since he was serving as captain of the vessel during the dive, as required by the United States Coast Guard.

51.  Because the Court has found that these failures were a legal cause of Bill's death, the Court finds and concludes that McCrea was negligent in this respect.  The Court reiterates its

finding that McCrea enhanced the inherent risks and hazards associated with the dive through his negligence.

**VII. Gross Negligence Claims Against Smith/HSS and McCrea**

52.  Because the Court's jurisdiction is in admiralty, the Court "looks to the common law in considering maritime torts." Royal Ins. Co. of Am. v. Sw. Marine, 194 F.3d 1009, 1015 (9th Cir. 1999) (alterations omitted) (citation omitted).  Hawaii law recognizes that gross negligence has been defined as "includ[ing] indifference to a present legal duty and utter forgetfulness of legal obligations so far as other persons may be affected."  Pancakes of Hawaii, Inc. v. Pomare Properties Corp., 944 P.2d 83, 90 (Haw. Ct. App. 1997) (alterations omitted) (citation omitted)); see also Mullaney v. Hilton Hotels Corp., 634 F. Supp. 2d 1130, 1154 (D. Haw. 2009) (noting that to succeed on a claim for gross negligence a party must show that there has been "an entire want of care which would raise the presumption of a conscious indifference to consequences" (citation omitted)).  It has been acknowledged in the admiralty context that gross negligence is a "point on a continuum of probability and its presence depends on the particular circumstances of each case."  Royal Ins. Co. of Am., 194 F.3d at 1015 (alteration omitted) (citations omitted); see also

Pancakes, 944 P.2d at 90 ("The element of culpability that characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence." (alterations omitted) (citation omitted)).

53.   The Court finds and concludes that Smith/HSS and McCrea's conduct does not rise to the level of gross negligence. Plaintiff has failed to put forth sufficient evidence that Smith/HSS and McCrea acted with "utter forgetfulness" of their duties, an entire want of care for the rights of others, or with conscious indifference to the consequences of their actions. See, e.g., Treco v. Bosick, 199 A.2d 752, 754 (Del. Super. Ct. 1964) (defining "conscious indifference" as "a foolhardy 'I-don't-care-a-bit-what-happens' attitude").   The Court notes, for example, that Smith and McCrea attempted to rescue and resuscitate Bill, hardly showing "utter forgetfulness" of their duties, complete want of care, or a conscious indifference to the consequences of their actions.   The Court therefore concludes that Plaintiff has failed to prove her claim for gross negligence as against Smith/HSS and McCrea.

**VIII.    Claims Against PADI**

54.   As noted above, Plaintiff stipulated that her one claim against PADI was that PADI was grossly negligent in

following EFR's difference on compressions procedures in 2011. Pretrial Conf. Tr. 90-91.  Plaintiff claims that PADI was grossly negligent in instituting a land-based resuscitation protocol as training for its member instructors who would be providing care to near drowning victims.  Plaintiff maintains that the EFR guidelines emphasized chest compressions over rescue breaths and that PADI improperly presented this information to its instructors.  The Court finds and concludes that PADI was neither negligent[10] nor grossly negligent in this regard.

55.  Specifically, Plaintiff contends that McCrea and Smith attended the PADI Member Forum in February 2012, at which they received information on current EFR procedures for emergency care.  See Ex. 402 (Smith PADI records), at PADI 00141; Ex. 401 (McCrea PADI records), at PADI0055; Ex. 111 (2012 Member Update Presentation), at 42-47.  According to Plaintiff, McCrea and

---

[10] As noted above, the Court previously granted Partial Summary Judgment as to Plaintiff's negligence claim against PADI.  During Closing Arguments on Day 11 of trial (July 7), Plaintiff made an oral motion pursuant to Federal Rule of Civil Procedure 54(b) to amend the Court's earlier ruling regarding its negligence claim against PADI.  Because the Court finds PADI was neither negligent nor grossly negligent, Plaintiff's motion is moot and denied.

Smith also received EFR "Revised Materials," including a brochure that informed them that "[d]elaying chest compressions for any reason is counterproductive," and that if the rescuer feels uncomfortable giving rescue breaths, he or she should "RELAX!" and provide "continuous chest compressions."[11]  Ex. 157 (EFR Training Material), at PADI001580-81.  Plaintiff argues that this information caused Smith not to provide rescue breaths during Bill's tow and caused McCrea to only provide compressions once Bill was on board the boat.  Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, at 46.  In Closing Arguments, Plaintiff cited to testimony from Smith that he may have been "combining" his "EFR training with" other training in determining whether to check for a heartbeat prior to administering rescue breaths.  Smith Trial Tr. 2-91.  With respect to McCrea, Plaintiff cites to McCrea's testimony that EFR procedure provided that he should administer chest

---

[11] Plaintiff cites to a PowerPoint presentation given at the Member Forum which, in turn cites to revised EFR materials, including Exhibit 157.  See Ex. 111 (2012 Member Update Presentation), at 44.  On this basis, Plaintiff claims that the material was provided to Smith and McCrea.  The Court notes that McCrea and Smith did not specifically testify about materials received at the Member Forum.

compressions prior to giving rescue breaths.  McCrea Trial Tr. 4-116, 3-86.

56.  First, as noted above, the Court finds and concludes that although changes were made to the EFR guidelines in response to changes instituted by ILCOR and its member organizations regarding CPR, these changes did not do away with rescue breaths, but only changed the recommendation to providing chest compressions prior to rescue breaths.  Ex. 150, 151.  More importantly, the evidence demonstrates that EFR made clear representations to its instructors in its Responder Newsletter that drowning presents "[a] [s]pecial [r]esuscitation [s]ituation" and that reference should be made to the PADI Rescue Diver Manual or the PADI Instructor Manual for further instruction.  Ex. 151, at PADI001548.  The Responder additionally informed EFR instructors that according to the AHA guidelines, "if you suspect possible drowning, begin with CPR rescue breaths before chest compressions."  Id. at PADI001543. PADI provided the same information to its members in its Training Bulletin.  Ex. 150, at PADI001857.

57.  In turn, the PADI Rescue Diver Manual did not change following the updates to the EFR guidelines and Plaintiff's own experts, Dr. Cianci and Weber endorsed PADI guidelines.

Shreeves Trial Tr. 7-27; Cianci Trial Tr. 4-55; Weber Trial Tr. 5-76.  As noted above, Dr. Cianci testified that McCrea and Smith should have followed the PADI guidelines but did not, and Weber testified that if McCrea and Smith had followed the PADI guidelines and protocols, she would have no issue with their rescue attempt.  Cianci Trial Tr. 4-55; Weber Trial Tr. 5-76. Dr. Cianci and Weber's testimony indicates that PADI guidelines were appropriate, and given that the Responder referred EFR members to PADI materials in the case of drowning victims, their opinions negate Plaintiff's claim of any negligence (i.e., gross negligence or ordinary negligence).

58.  Plaintiff claims that McCrea and Smith were confused about the proper procedure for near-drowning victims because they attended informational Member Forums put on by PADI in which chest compressions were emphasized and received EFR materials containing similar information.  Plaintiff's Post-Trial Findings of Fact and Conclusions of Law, at 44-45. However, even if Smith and McCrea were confused about the proper protocol, they should not have been, given that the Responder expressly provided that based on the AHA CPR changes, in "possible drowning" cases, rescue breaths should be administered before chest compressions.  Ex. 151, at PADI001543.

59.   In any event, the Court finds and concludes that any failure on behalf of PADI with respect to the EFR modifications was not a legal cause of Bill's death.   Indeed, the Court has found that McCrea continued to provide CPR with chest compressions and rescue breaths up until the boat arrived to the mouth of the harbor (although the Court has found McCrea and Smith should have immediately provided CPR and oxygen before leaving for the harbor).   Accordingly, Plaintiff's argument that McCrea did not provide rescue breaths and only provided chest compressions as a result of the EFR guidelines fails.   With respect to any allegation that McCrea should have given rescue breaths prior to initiating chest compressions, no witness testified that McCrea providing thirty chest compressions prior to giving two rescue breaths, respirations, or ventilations, contributed to the failure to resuscitate Bill.   The Court finds there is no evidence that providing thirty chest compressions prior to giving two rescue breaths contributed to the failure to resuscitate Bill.   As to Smith's failure to provide rescue breaths in the water and the allegation that this was influenced by the EFR guidelines, the Court has found that Smith's decision was reasonable, given that he was approximately a minute away from the boat, obviating Plaintiff's argument in this regard.

Moreover, the Court has found that Smith and McCrea were negligent by failing to work together to administer CPR along with oxygen once Bill was on the boat.  This negligence was not influenced by the changes to the EFR guidelines regarding chest compressions.

60.  For all of these reasons, the Court finds and concludes that Plaintiff has failed to prove its claims against PADI.

## IX.  Comparative Fault and Counterclaim

61.  "Under admiralty law, comparative negligence, although not a complete bar to recovery, will reduce an award by the percentage of plaintiffs' own negligence." Korpi v. United States, 961 F. Supp. 1335, 1347 (N.D. Cal. 1997), aff'd, 145 F.3d 1338 (9th Cir. 1998).

62.  Based on all the evidence adduced, and having observed the demeanor of the witnesses, the Court concludes that Bill was contributorily negligent insofar as he entered the overhead environment of the arches at Skull Cavern, but was not contributorily negligent with respect to the alleged loss of buoyancy control.  The Court finds that Hambrook was not contributorily negligent as alleged by Defendants.

63.   Specifically, the Court concludes, based on Nicolas's testimony that he observed Smith lead his father directly into Skull Cavern, that Bill did not lose control of his buoyancy in the manner claimed by Defendants.   The Court concludes that instead Bill's ascent to the surface was caused by the hydraulic action of the surge waters at this shallow dive site, a locally well-known phenomenon about which Bill, Hambrook, and Nicolas were not warned and were not prepared to encounter.   As noted above, this finding is support by Smith's PADI Incident Report and the Coast Guard Report and police report made right after the incident, which said nothing about a loss of buoyancy; and by McCrea's testimony that Bill appeared to be in control of his BCD and his buoyancy when he ascended to the surface the first time and then proceeded to descend.

64.   The Court further concludes that in the circumstances of his being tumbled by 3-4 foot waves in a shallow rocky area it is not reasonable to expect Bill to have been able to recover his scuba regulator, given that he had no experience with diving in surf and surge conditions or in an overhead environment, indeed that he had very little diving experience of any kind, and that he had only been briefly trained on this skill in a swimming pool and in relatively calm waters.   Weber Trial Tr. 5-

41-42 (noting that regulator recovery skill is not practiced in whitewater because it would be dangerous to do so). Predictably, the situation caused panic, further hindering Bill's ability to respond.  Ex. 178 (Smith Dep. Tr. 262-63) (testifying that Bill probably did not try to replace his regulator because he was "overwhelmed with the senses and being in a panic situation"); Ex. 11 (PADI Open Water Diver Manual), at 156 ("Divers who have a problem and panic lose self control, and sudden, unreasoned fear and instinctive inappropriate actions replace controlled, appropriate action.").

65.  However, the Court concludes that Bill was contributorily negligent with respect to entering the overhead environment at Skull Cavern.  As discussed in the Court's findings, both Hambrook and Nicolas testified that they were informed prior to the dive that they would be entering the arches at Skull Cavern.  Bill, Hambrook, and Nicolas were PADI-certified divers and learned in their training that they should not enter an overhead environment unless they received specific training teaching them how to do so.  Indeed, Engel, who trained Bill, Hambrook, and Nicolas in Calgary, testified that he taught them the information contained in the Open Water Diving Manual, which included an explanation of the hazards associated with

109

overhead environments as well as the need for additional
training.  Ex. 180 (Engel Dep. Tr. 200); Ex. 11 (Open Water
Diving Manual), at 139.  The divers also signed a PADI Statement
of Understanding acknowledging that they should "[e]ngage only
in diving activities consistent with [their] training and
experience" and that they should not "engage in cave and
technical diving unless specifically trained to do so."  Ex. 232
(Maui Dive Company Records), at 9, 17, 30; Hambrook Trial Tr. 9-
90-92.

    66.  Under these circumstances, the Court finds and
concludes that Bill should have realized that entering the
overhead environment at Skull Cavern could be dangerous and that
he should have considered that he was not trained to safely
enter the cavern.  However, Bill could not have recognized the
specific hazards associated with the dive site given that he was
an inexperienced diver, had never dived at the site before, and
was not warned by McCrea or Smith regarding the surge and the
change in depth.  The Court also acknowledges that Bill was
following Smith's lead as the divemaster and relying on Smith's
experience and expertise.  Under these circumstances, the Court
finds that Bill was twenty percent contributorily negligent in
this case.

67.  Finally, the Court concludes that McCrea and Smith/HSS's counterclaims against Hambrook alleging she delayed the resuscitation efforts to save her husband by refusing to follow McCrea's orders to reboard the HSS dive boat, thereby causing Bill's death, are without merit.  These allegations are directly contradicted by Hambrook's testimony that she got out of the way as soon as she was asked to, Hambrook Trial Tr. at 8-94-95; and by Chelsea's testimony that her mother swung out of the way as soon as Smith told her to, Chelsea Trial Tr. at 5-142, 5-144.  Moreover, McCrea testified that the delay in getting Bill onto the boat because Hambrook did not get out of the way was "approximately" five seconds.  McCrea Trial Tr. 4-121-122.  Accordingly, even if there was some delay caused by Hambrook blocking Smith and Bill's entry to the boat, there was insufficient evidence that this was a factor contributing to a delay in Bill's resuscitation.

68.  The Court notes that given its finding that Bill was only twenty percent contributorily negligent, application of Hawaii's contributory negligence statute, HRS § 663-31, would not change the result in the instant case.  See HRS § 663-31(a) (noting contributory negligence bars recovery for negligence resulting in death or injury where the contributory negligence

is "greater than the . . . aggregate negligence of such persons against whom recovery is sought").

## X.   Damages

### A. Pre-Death Pain and Suffering

69.   Plaintiff is entitled to seek survival damages for pre-death pain and suffering under general maritime law.  See Evich v. Morris, 819 F.2d 256, 258 (9th Cir. 1987) ("[F]ederal circuit courts considering survival damages have generally stated that pre-death pain and suffering is compensable."), overruling on other grounds recognized by Saavedra v. Korean Air Lines Co., 93 F.3d 547, 554 (9th Cir. 1996); Voillat v. Red & White Fleet, No. C 03-3016 MHP, 2004 WL 547146, at *5 (N.D. Cal. Mar. 18, 2004) ("Plaintiffs are entitled to seek damages for pre-death pain and suffering under a general maritime survival action.").

70.   The Court has found that Bill was conscious of his impending death for a period of at least 1 to 2 minutes.  This finding is supported by Dr. Cianci's testimony on the physiological experience of drowning.  Both Chelsea and McCrea also testified that Bill appeared panicked and was yelling for help when he arose to the surface of the water without his regulator in his mouth.  McCrea Trial Tr. 4-105; Ex. 179 (McCrea

Dep. Tr. 111-12); Chelsea Trial Tr. 5-135-136.  The Court also notes that there was no evidence presented that prior to his drowning, Bill suffered a serious injury, such as a skull fracture, that could have indicated Bill was unconscious at this time.  See Cook v. Ross Island Sand & Gravel Co., 626 F.2d 746, 750 (9th Cir. 1980) (citing evidence that decedent had not sustained a skull fracture to support award of pre-death pain and suffering); see also S. Pac. Co. v. Heavingham, 236 F.2d 406, 409 (9th Cir. 1956) ("And if the jury were of the view that he probably suffocated from the steam, they would have the right to conclude that a man whose breath has been cut off nevertheless would remain conscious for an appreciable period of time.").

71.  Based on the evidence adduced, the Court concludes that $50,000 to Hambrook as Personal Representative of the Estate of William Joseph Savage ("the Estate") is an appropriate award for conscious pre-death pain and suffering.  Cf. Cook, 626 F.2d at 750-52 (approving trial court's reduction of jury award for conscious pain and suffering in a drowning death from $100,000 to $35,000 for a period of consciousness of two-and-a-half-minutes); Tancredi v. Dive Makai Charters, 823 F. Supp. 778, 790 (D. Haw. 1993) ("The court finds that Tancredi did

113

experience distress, pain and suffering when he had difficulty in breathing and died as a result of drowning.  Based on the evidence presented, the court finds that plaintiffs are entitled to $50,000 for Tancredi's conscious pain and suffering."), overruling on other grounds recognized by McClenahan, 888 F. Supp. at 123.

### B. Loss of Support

72.  As discussed in the Court's Order Regarding Motions in Limine, Plaintiff has elected to seek loss of support damages as a wrongful death beneficiary as opposed to lost future earnings "on behalf of her husband's Estate."  Order Regarding Motions in Limine, at 14 (quoting Pl.'s Opp. to Smith and HSS MIL No. 1, at 5, ECF No. 266).  Plaintiff is entitled to loss of support damages as a wrongful death beneficiary.  See In re Air Crash Off Point Mugu, California, on Jan. 30, 2000, 145 F. Supp. 2d 1156, 1166 (N.D. Cal. 2001) (noting pecuniary damages available under maritime law include loss of support); Voillat, 2004 WL 547146, at *6 ("As wrongful death beneficiaries, plaintiffs are entitled to damages for loss of support.").  Loss of support damages include "the financial contributions that the decedent would have made to his dependents had he lived."  Sea-Land Servs., Inc. v. Gaudet, 414 U.S. 573, 584-85 (1974), superseded

114

by statute on other grounds as stated in <u>Miles v. Apex Marine</u>

<u>Corp.</u>, 498 U.S. 19 (1990); <u>see</u> <u>also</u> <u>Voillat</u>, 2004 WL 547146, at

*6 (noting "the support plaintiff[] would receive as a result of

[the decedent's] death would . . . come from his future

earnings"); <u>Saavedra</u>, 93 F.3d at 554-55 (affirming loss of

support award in maritime action despite challenge to the method

in which expert economist calculated the decedent's future

earnings).

73.  "Although the past earnings of a decedent are clearly

relevant to the probable value of the support lost by the

beneficiaries on account of the death, such earnings are not

dispositive in evaluating the amount of the damages."  1 Stuart

M. Speiser & James E. Rooks, Jr., <u>Recovery for Wrongful Death</u>

(2012) § 6:16 (4th ed. 2005).  Accordingly, "[t]he proper

standard for recovery in a wrongful death action is the

decedent's future earning capacity, not actual earning history."

<u>Id.</u>

74.  Defendants' forensic accounting expert, Garret Hoe,

provided a report and testified regarding Bill's lost earnings.

Ex. 253 (Hoe Report).  However, Hoe's calculations relied solely

on Bill's past earning history and did not consider the evidence

regarding Bill's capacity to earn between 60,000 and 75,000 in

Canadian dollars (as testified by Wilson) or 64,416 in Canadian dollars (as testified by Dr. Male) as he began working full time as a foreman-supervisor for a landscaping company or in his business.  Accordingly, the Court finds Hoe's calculations to be unreasonable.

75.  Plaintiff's economic expert, Dr. Male, provided an analysis of "Income and Support Loss."  Ex. 65 (Male Expert Report).  The Court has numerous problems with Dr. Male's determination of loss of support, including matters such as utilizing a poverty threshold in determining personal maintenance expenditures[12] and failing to include any consideration of Hambrook's substantial earnings, which exceeded 180,000 Canadian dollars per year, or the fact that the family was quite well off and took numerous trips.  The Court is also troubled by Dr. Male's use of a barebones personal maintenance deduction based on a survival claim, as opposed to a personal consumption deduction for a loss of support claim.

76.  The Court has spent substantial time attempting to resolve these concerns, and has concluded that the only

---

[12] The Court notes that in his testimony, Dr. Male alluded to "the literature" as finding this to be appropriate.  Male Trial Tr. 6-140.

reasonable means of doing so is to deduct a flat amount from Dr. Male's total of 475,425 U.S. dollars for loss of support. The Court finds that a deduction of 50,000 U.S. dollars is appropriate. Accordingly, the Court concludes that Plaintiff should be awarded a total of 425,425 U.S. dollars for loss of support. Plaintiff has not provided the Court with any evidence or suggestions as to how this amount should be divided between certain members of the family, and therefore the Court will make the award to Hambrook, Chelsea, and Nicolas jointly.

### C. Loss of Services

77. Recovery for loss of services may include "[s]ervices the decedent performed at home or for his spouse." Gaudet, 414 U.S. at 585. "A spouse is entitled to the pecuniary value of the services which the deceased spouse might reasonably have performed . . . ." Speiser & Rooks, supra § 6:40. Notably, contrary to Defendants' contention, "it is not necessary to actually hire someone to perform [such] services, after the decedent's death, to recover for household services" or to have evidence of replacement costs incurred. Id. (citing R.I. Gen. Laws § 10-7-1.1 ("The fair value of homemaker services should not be limited to moneys actually expended to replace the services usually provided by the homemaker."); Reid v. State

117

Through Dep't of Transp. & Dev., 637 So. 2d 618, 628 (La. Ct. App. 1994), ("At the outset we note that a claim for lost services is not defeated by absence of proof of actual out-of-pocket replacement costs."), writ denied, 642 So. 2d 198 (La. Aug. 16, 1994)).

78.  Defendants' expert concluded there would be no loss of services based on the absence of evidence of actual costs, such as receipts or cancelled checks, incurred after Bill's death. Ex. 253 (Hoe Report), at 7.  However, as noted above, such evidence is not required to recover for loss of household services.

79.  Bill's relatively low earnings for the years prior to his death were explained by Dr. Male as a result of being the primary caregiver for his young children; with Hambrook earning in the neighborhood of 180,000 Canadian dollars a year as a car rental executive.  Dr. Male now concludes that with Chelsea and Nicolas maturing and generally being away at school, his time devoted to household work would be reduced as Bill would be able to devote himself full time to his business, in a related field, or as a foreman-supervisor of a landscaping company.  Indeed, Dr. Male concludes that in 2012, the year of Bill's tragic death, his earnings would have jumped dramatically to 64,416

annualized Canadian dollars (which were reduced to 48,312

Canadian dollars since he died on April 11, 2012).  Ex. 65 (Male

Report), at 6.

80.  The Court notes that Dr. Male's report, in computing

household work for past losses, arrived at a total average

number of 27 hours per week for household services; whereas for

future losses he determined 19.88 total average hours per week

would be appropriate.

81.  In his testimony before the Court, Dr. Male explained

as follows with respect to past losses:

> I chose a midpoint between 35 [the hours reported
> by Hambrook] and the average of 20.  So I assumed
> that four-year period he would have averaged 27
> hours a week as he gradually began to spend more
> time on his business and less time at home.

Male Trial Tr. 6-110.

82.  Dr. Male explained as follows with respect to future

losses:

> If you turn to the future loss page, the
> difference starts at the top.  Instead of --
> instead of assuming the 27-hour weekly production
> rate, I just assumed the average rate of 19.88.
> So, I assumed that by this time Mr. Savage would
> have been either working full-time or devoting
> most of his full-time effort to -- to his
> business so that he would -- his ability to
> produce household services at home would be
> reduced to the average.

Id. 6-113. Dr. Male represented that 19.88 was a statistical average. Id. 6-109.

83. Again, the Court notes that with respect to his calculation of future losses (which began in the year 2016), Dr. Male assumed that "by this time Mr. Savage would have been either working full-time or devoting most of his full-time effort . . . to his business . . . ." Id. Nevertheless, his calculation of loss of income and support provides for Bill earning an annualized incoming of 64,416 Canadian dollars for the year 2012 and including the years 2013, 2014, and 2015; thus, contrary to his aforesaid testimony, assuming that Bill commenced full time devotion to his work outside of the home in April of 2012.

84. The Court further concludes that with Bill commencing full time devotion to his work outside of the home in April of 2012, the hours for household work projected by Hambrook and Dr. Male from that time and for the balance of his "healthy life expectancy" (which Dr. Male set at 23.63 years, Ex. 65 (Male Report), at 6)) are unrealistic and should be reduced. The Court further finds that with the necessary investment of time that Bill would have to expend in expanding his current business or in working full time as a foreman-supervisor in the

120

landscaping field, as well as entering into his 50s, that it is improbable that he would achieve the average number of weekly hours of household services relied upon by Dr. Male.

85.  Under the circumstances the Court is faced with, the Court finds an appropriate means to resolve these concerns is to reduce Dr. Male's calculation of loss of household services (of 294,973 U.S. dollars) by a flat rate deduction of 50,000 U.S. dollars.  Accordingly, the Court concludes that Plaintiff should be awarded a total of 244,973 U.S. dollars for loss of services. Plaintiff has not provided the Court with any evidence or suggestions as to how this amount should be divided between certain members of the family, and therefore the Court will make the award to Hambrook, Chelsea, and Nicolas jointly.

**D. Loss of Society**

86.  As discussed in the Court's Order Regarding Motions in Limine, under Sutton v. Earles, Plaintiff can recover for loss of society.  26 F.3d 903, 915-17 (9th Cir. 1994); see also Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398, 1407 (9th Cir. 1994) ("We have also held that the beneficiaries of passengers killed or injured on *state territorial waters* can recover [loss of society] damages." (citing Sutton, 26 F.3d 903)); MacLay v. M/V SAHARA, 926 F. Supp. 2d 1209, 1220 (W.D. Wash. 2013) (noting

121

that in the Ninth Circuit, "beneficiaries of non-seamen in territorial waters may . . . recover for loss of society under general maritime law"). Loss of society covers "a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." Gaudet, 414 U.S. at 585.

87. Given the evidence adduced regarding the relationship between Bill and his family, the Court concludes that $10,000 per year for Hambrook and $10,000 a year each for Chelsea and Nicolas, multiplied by Bill's statistical life expectancy of 32.47 years, Male Trial Tr. 6-114, (totaling $324,700 each) is an appropriate award for loss of society. Cf. Sutton, 26 F.3d at 917 (discussing award of $10,000 per year to beneficiaries for loss of society).[13]

_____

[13] The Court notes that in Sutton v. Earles, the Ninth Circuit determined that "the district court erred in using the life expectancies of the decedents rather than those of the surviving parents" to calculate loss of society damages, noting that "[i]t simply makes no sense to calculate the loss to the parents, who presumably have shorter remaining life expectancies at any given time than their children, by the child's life expectancy." 26 F.3d at 918-19. With respect to Nicolas and Chelsea, use of Bill's life expectancy is appropriate as he presumably would have a shorter life expectancy than his children. Hambrook was 50 at the time of Bill's death, while

(continued . . . )

### E. Emotional Distress

88.  A claim for negligent infliction of emotional distress ("NIED") is "cognizable under general maritime law."  Fawkner v. Atlantis Submarines, Inc., 135 F. Supp. 2d 1127, 1134 (D. Haw. 2001).  As recognized by the Ninth Circuit, the issue here "is not the emotional grief caused by losing a love one," but "[i]nstead . . . the *psychic injury* that comes from *witnessing* another being seriously injured or killed."  Chan, 39 F.3d at 1408.

89.  The Ninth Circuit has not decided which of "three main theories limiting recovery of damages for emotional distress" applies in the admiralty context.  Id.; see also Stacy v. Rederiet Otto Danielsen, A.S., 609 F.3d 1033, 1035 (9th Cir. 2010) (considering a claim under the "zone of danger" test but not foreclosing the possibility that other tests may apply).

---

( . . . continued)

Bill was 49.  The Court is also aware that women tend to have higher life expectancies than men.  See, e.g., Statistics Canada: Health-adjusted life expectancy, by sex, http://www.statcan.gc.ca/tables-tableaux/sum som/ l01/ cst01/hlth67-eng.htm (Mar. 24, 2012).  Thus, the Court finds Bill's life expectancy as an appropriate means to calculate Hambrook's loss of society damages.

Here, the Court finds and concludes that Plaintiff can recover for emotional distress under the "bystander proximity" test.

90.   Pursuant to the "'bystander proximity' or 'relative bystander' rule," a plaintiff can recover if he or she "(1) is physically near the scene of the accident; (2) personally observes the accident; and (3) is closely related to the victim." Fawkner, 135 F. Supp. 2d at 1134 (quoting Chan, 39 F.3d at 1409).  The Court heard testimony that Hambrook, Nicolas, and Chelsea were near the scene of Bill's drowning and personally observed the circumstances leading up to his death. Hambrook was Bill's wife, and Chelsea and Nicolas his children, thus they are closely related.

91.   The Court finds and concludes that based on the testimony and demeanor of Hambrook, Chelsea, and Nicolas, all three suffered emotional distress as result of witnessing the events leading up to Bill's fatality.  Accordingly, Plaintiff may recover for her claim of emotional distress.

92.   The Court concludes that $50,000 each is an appropriate award to Hambrook, Chelsea, and Nicolas for their emotional distress in witnessing Bill's death firsthand.

124

## F. Hedonic Damages

93.   The Court has found that Plaintiff may recover hedonic damages under Hawaii law, HRS § 663-8.5(a), to supplement her right of recovery under general maritime law.  "Hedonic damages are damages 'for the loss of enjoyment of life, or for the value of life itself, as measured separately from the economic productive value that an injured or deceased person would have had.'"  Montalvo v. Lapez, 884 P.2d 345, 347 n.2 (Haw. 1994) (quoting Black's Law Dictionary 391 (6th ed. 1990)); see also HRS § 663-8.5(a) (providing that "loss of enjoyment of life" damages are available).  With respect to hedonic damages, the Hawaii Supreme Court has held:

> The measurement of the joy of life is intangible. A jury may draw upon its own life experiences in attempting to put a monetary figure on the pleasure of living.  It is "a uniquely human endeavor . . . requiring the trier of fact to draw upon the virtually unlimited factors unique to us as human beings."  Testimony of an economist would not aid the jury in making such measurements because an economist is no more expert at valuing the pleasure of life than the average juror.

Montalvo, 884 P.2d at 366 (citations omitted).

94.   "Many jurisdictions permit recovery for hedonic loss, but only as one of the factors that make up the general damages award for pain and suffering."  Speiser & Rooks, supra § 6:44.

125

The "majority of states" also disallow "[p]ostmortem hedonic damages." Id. § 6:45.  In Connecticut, one of the states that does allows post-mortem hedonic damages, the state's Supreme Court noted that possible damages available included "compensation for the destruction of [the decedent's] capacity to carry on and enjoy life's activities in a way she would have done had she lived." Katsetos v. Nolan, 368 A.2d 172, 183 (Conn. 1976).

95.  In Hawaii, as in Connecticut, "a decedent's recovery for loss of enjoyment of life is not limited by death" and may be considered separately from pain and suffering. Polm v. Dep't of Human Servs., No. CAAP-13-0004020, 2014 WL 7390879, at *20-21 (Haw. App. Ct. Dec. 30, 2014).  Thus, hedonic damages are available in the instant case.

96.  Given the evidence adduced regarding Bill's enjoyment of life while he was alive, and his cherished relationship with his family, the Court finds that an award of $900,000 in hedonic damages is appropriate to be awarded to Hambrook as Personal Representative of the Estate of William Joseph Savage. Cf. Sherrod v. Berry, 629 F. Supp. 159, 160 (N.D. Ill. 1985) (jury award of $850,000 in hedonic damages for a wrongful death action under 42 U.S.C. § 1983), rev'd on other grounds, 856 F.2d 802

126

(7th Cir. 1988); <u>Polm</u>, 2014 WL 7390879, at *3, 20-21 (discussing the Hawaii Intermediate Court of Appeals' affirmance of an award of $250,000 for pain and suffering and loss of enjoyment of life to the decedent, who was 14 months old at the time of death).[14]

### G. Punitive Damages

97. "In admiralty law, punitive damages 'may be imposed for conduct which manifests reckless or callous disregard for the rights of others or for conduct which shows gross negligence or actual malice or criminal indifference.'" <u>Kahumoku v. Titan Mar., LLC</u>, 486 F. Supp. 2d 1144, 1152-53 (D. Haw. 2007) (quoting <u>Churchill v. F/V Fjord</u>, 892 F.2d 763, 772 (9th Cir. 1998)). Given the Courts findings and conclusions regarding gross negligence, punitive damages are unwarranted.

---

[14] The Court notes that in <u>Polm</u>, the trial judge limited the award of loss of enjoyment of life based on the decedent's "checkered and tumultuous past," including his mother's methadone addiction and father's "intermittent fits of anger or violence"; the fact that "he is likely to have had social and emotional challenges in the future"; and the likelihood that the decedent would not have been provided "a stable environment in which to flourish." <u>Polm v. Dep't of Human Servs.</u>, Civ. No. 11-1-0548-03 GWBC, at 39-40 (Cir. Ct. First Cir. of Hawaii filed Aug. 7 2013) (Findings of Fact and Conclusions of Law and Order). The court found that the decedent's "quality of life would not be optimal, which significantly reduces the value of his loss of enjoyment of life." <u>Id.</u> at 40. These (somewhat questionable) limitations are clearly not present in the instant case.

**H. Prejudgment Interest**

98.   "In admiralty law, the district court has discretion to award prejudgment interest to accomplish the just restitution of injured parties." Columbia Brick Works, Inc. v. Royal Ins. Co. of America, 768 F.2d 1066, 1068 (9th Cir. 1985).   "The district court also has broad discretion to determine when prejudgment interest commences and what rate of interest to apply." Id.

99.   Plaintiff does not request the use of a specific interest rate but requests that the interest be applied from the date of the original Complaint.   This district court has noted that to calculate prejudgment interest under admiralty law, "the Ninth Circuit has adopted the standards set for post-judgment interest set forth in 28 U.S.C. § 1961(a)[15], unless the trial

---

[15]   28 U.S.C. § 1961(a) provides in relevant part,

Interest shall be allowed on any money judgment in a civil case recovered in a district court . . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment.

(continued . . . )

judge finds, on substantial evidence, that the equities of a particular case require a different rate."  The Pasha Grp. v. Harbour Forwarding Co., No. CIV. 11-00358 DAE-RLP, 2012 WL 779342, at *8 (D. Haw. Feb. 16, 2012), findings and recommendation adopted sub nom. Pasha Grp. v. Harbour Forwarding Co., No. CIV. 11-00358-DAE-RLP, 2012 WL 777301 (D. Haw. Mar. 8, 2012).

100. The Court finds that the rate established in 28 U.S.C. § 1961(a) is appropriate as Plaintiff has not argued otherwise. The weekly average 1-year constant maturity Treasury yield for the week prior to March 14, 2014 (March 7, 2014) was 0.12%.  The Court applies this rate for a two year and five month period (between March 2014 and August 2016), i.e., 2.42 years.  The Court concludes that under the circumstances, Plaintiff should be awarded prejudgment interest pursuant to this calculation, as provided below.

---

( . . . continued)

Upon the Court's independent research, from March 2014 to August 2016, this interest rate has fluctuated between 0.09% to 0.71%.

**XI.   Calculation of Damages**

101. The Court provides the following damages calculations for Hambrook as Personal Representative of the Estate; jointly to Hambrook, individually, and Hambrook as Personal Representative for the benefit of Chelsea Savage and Nicolas Savage; for Hambrook, individually; for Hambrook as Personal Representative for the benefit of Chelsea Savage; and for Hambrook as Personal Representative for the benefit of Nicolas Savage.

| **Damages to the Estate** | **Amount** |
|---|---|
| Conscious Pre-Death Pain and Suffering | $50,000 |
| Hedonic Damages | $900,000 |
| Total less 20% contributory negligence | $760,000 |
| Prejudgment Interest[16] | $2,207.04 |
| **Total Award** | $762,207.04 |

---

[16] [Total less 20% contributory negligence] x .12% x 2.42 years.

130

| **Combined Damages to Hambrook Individually and Hambrook as Personal Representative of Chelsea and Nicolas** | **Amount** |
|---|---|
| Loss of Support | $425,425 |
| Loss of Services | $244,973 |
| Total less 20% contributory negligence | $536,318.40 |
| Prejudgment Interest | $1,557.47 |
| **Total Award** | $537,875.87 |

| **Damages to Hambrook, Individually** | **Amount** |
|---|---|
| Loss of Society | $324,700 |
| Emotional Distress | $50,000 |
| Total less 20% contributory negligence | $299,760 |
| Prejudgment Interest | $870.50 |
| **Total Award** | $300,630.50 |

| **Damages to Hambrook as Personal Representative for the Benefit of Chelsea Savage** | **Amount** |
|---|---|
| Loss of Society | $324,700 |
| Emotional Distress | $50,000 |
| Total less 20% contributory negligence | $299,760 |
| Prejudgment Interest | $870.50 |
| **Total Award** | $300,630.50 |

| Damages to Hambrook as Personal Representative for the Benefit of Nicolas Savage | Amount |
|---|---|
| Loss of Society | $324,700 |
| Emotional Distress | $50,000 |
| Total less 20% contributory negligence | $299,760 |
| Prejudgment Interest | $870.50 |
| **Total Award** | $300,630.50 |

| Total Damages | **$2,201,974.41** |
|---|---|

## XII. Joint and Several Liability

102.  "For more than a century, general maritime law has held joint tortfeasors jointly and severally liable for all of the plaintiff's damages suffered at their hand." Coats v. Penrod Drilling Corp., 61 F.3d 1113, 1116 (5th Cir. 1995).  Where there is joint and several liability, "the risk of noncollection is borne by the defendants." Id.  Accordingly, Plaintiff "can collect his entire judgment from a single defendant, leaving to the defendants allocation of fault among themselves." Id.

103. Defendants in this case have not filed cross-claims against each other.  Having found that Smith, HSS, and McCrea are all legally responsible for the compensatory damages set for above, it is unnecessary for the Court to allocate fault between

them. Judgment shall enter against these defendants, jointly, and severally, for the damages listed above.

104. The Court notes that even if Hawaii law applied with respect to joint and several liability, it would not change the Court's conclusion. Under Hawaii law, joint and several liability applies "[f]or the recovery of economic damages against joint tortfeasors in actions involving injury or death to person[s]." HRS § 663-10.9(1). For the recovery of noneconomic damages, joint and several liability applies in cases "involving injury or death to persons against those tortfeasors whose individual degree of negligence is found to be twenty-five percent or more." Id. The Court finds that each of the relevant defendants (that is, excluding PADI) were at least twenty-five percent negligent in the instant case.

### DECISION

And now, following the conclusion of a bench trial in this matter, and in accordance with the foregoing findings of facts and conclusions of law, it is hereby ordered that judgment shall enter in favor of Plaintiff and jointly and severally against Defendants Smith, HSS, and McCrea in the above matter in the amount of $762,207.04 to Hambrook as Personal Representative of the Estate (for pre-death pain and suffering and hedonic

133

damages); $537,875.87 jointly to Hambrook, individually, and Hambrook as Personal Representative for the benefit of Chelsea Savage and Nicolas Savage (for loss of support and loss of services); $300,630.50 for Hambrook, individually (for loss of society and emotional distress); $300,630.50 for Hambrook as Personal Representative for the benefit of Chelsea Savage (for loss of society and emotional distress); and $300,630.50 for Hambrook as Personal Representative for the benefit of Nicolas Savage (for loss of society and emotional distress).  Because the Court finds and concludes that Plaintiff was not contributorily negligent, judgment in favor of Plaintiff is also appropriate with respect to the remaining counterclaims. Finally, the Court has determined that Plaintiff failed to prove her claims against PADI.  Accordingly, judgment in favor of PADI is appropriate for Plaintiff's claims against PADI.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 17, 2016.



_____
Alan C. Kay
Sr. United States District Judge

Hambrook v. Smith et al., Civ. No. 14-00132 ACK-KJM, Findings of Fact, Conclusions of Law, and Decision.